# 16-1463-CV

## United States Court of Appeals

### *for the*

## Second Circuit

DAVID GANEK,

*Plaintiff-Appellee,*

— v. —

DAVID LEIBOWITZ, REED BRODSKY, DAVID MAKOL, MATT KOMAR,
JAMES HINKLE, HOLLY J. TRASK, DAVID CHAVES, PATRICK
CARROLL, RACHEL ROJAS, DIEGO RODRIGUEZ, MARC P. BERGER,
CHRISTOPHER L. GARCIA, RICHARD B. ZABEL, BOYD M. JOHNSON, III,
PREETINDER S. BHARARA,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

NANCY GERTNER
ANNA BENVENUTTI HOFFMANN
BARRY SCHECK
NICK BRUSTIN
FARHANG HEYDARI
ALEXANDRA LAMPERT
RICK SAWYER
NEUFELD SCHECK & BRUSTIN, LLP
*Attorneys for Plaintiff-Appellee*
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ...................................................................5

A. The FBI and USAO prioritize insider trading investigations. .............................5

B. Defendants target Ganek, but fail to obtain evidence against him. ....................6

C. With no evidence, Defendants move forward with their search of Ganek..........8

D. Based on Defendants' fabrications, the FBI and USAO raid Ganek's Level Global offices. ....................................................................10

E. Defendants repeatedly refuse to take any action to mitigate the effects of their misconduct. ....................................................................11

F. Defendants' misconduct comes to light at the *Newman* trial. ............................14

G. The District Court rejects Defendants' attempt to dismiss the suit. ...................16

SUMMARY OF ARGUMENT ..............................................................18

LEGAL STANDARDS ........................................................................19

A. On a motion to dismiss, the complaint's allegations must be accepted as true..19

B. Qualified immunity may rarely be decided on a motion to dismiss....................21

ARGUMENT .......................................................................................22

I. The District Court correctly held Plaintiff alleges viable claims against the individual Defendants. ..............................................................22

    A. The only allegations implicating Ganek in insider trading were Defendants' fabrications. ....................................................22

    B. Defendants provide no basis to dismiss Ganek's Fifth Amendment due process claim. ....................................................26

    C. Defendants' search of Ganek's office, personal electronic devices, and emails without probable cause violated the Fourth Amendment............27

i

II. The District Court correctly held that Ganek plausibly alleged culpable involvement by the Supervisors. .......................................................................38

    A. This case is consistent with, but does not rely upon, the outcome in *Turkmen v. Hasty* ......................................................................................48

III. A reasonable supervisor would have known he could not ignore a subordinate's fabrication of evidence. ..............................................................................50

CONCLUSION .........................................................................................57

# TABLE OF AUTHORITIES

**Cases**

*650 Fifth Ave. & Related Props.*, 830 F.3d 66 (2d Cir. 2016)...................................29

*Ackerson v. City of White Plains*, 702 F.3d 15 (2d Cir. 2012) ................................37

*Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) ...................40

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)...............20

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994).............................................. 54, 56

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...........................................................51

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)...................... 19, 20, 47

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................ 19, 20, 21

*Closure v. Onondaga County*, No. 06-CV-926, 2007 WL 446595 (N.D.N.Y. Feb.

    7, 2007) .................................................................................................................54

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir.1995)........................................... 39, 43, 52

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971) ...................................................31

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) .............................24

*Dirks v. S.E.C.*, 463 U.S. 646 (1983) .........................................................................5

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ............................ 25, 36, 51, 56

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir.

    2002) ....................................................................................................................21

*DuBose v. Lefevre*, 619 F.2d 973 (2d Cir. 1980) .....................................................52

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167 (2d Cir. 2006) ..........................21

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ......................................................50

*Garcia-Catalan v. United States*, 734 F.3d 100 (1st Cir. 2013).............................47

*Golino v. City of New Haven*, 950 F.2d 864 (2nd Cir. 1991) ..................................38

*Green v. City of Mount Vernon*, 96 F. Supp. 3d 263 (S.D.N.Y. 2015) ..................53

*Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013).......................................................23

*Holmes v. Grubman*, 568 F.3d 329 (2d Cir. 2009) ..................................................20

*JP Morgan Chase Bank v. Altos Hornos de Mex.*, 412 F.3d 418 (2d Cir. 2005) ....26

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014) ................... 20, 21, 46

*Kentucky v. King*, 563 U.S. 452 (2011) ...................................................................29

*Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002).......................................................55

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)............................................56

*Marbury v. Madison*, 5 U.S. 137 (1803)..................................................................48

*Maryland v. Garrison*, 480 U.S. 79 (1987) ..................................................... 29, 53

*Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010)........................................56

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817 (2d Cir. 2014)................. 28, 36, 38

*McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004)...................................................21

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) ............................................ 27, 45, 56

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014) .........................................................46

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) ....................................................50

*Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108 (2d Cir. 2012) ......................35

*Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995)..........................................53

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) .................. 26, 27, 51

*Riley v. California*, 134 S. Ct. 2473 (2014) ...........................................................32

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007).......................................................25

*Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851 (2d Cir. 2014)......20

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009) ..................... 20, 22, 40

*Simmons v. City of Paris*, 378 F.3d 476 (5th Cir. 2004)..........................................53

*Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2012) ...................... 28, 36

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ...................................................56

*Turkmen v. Ashcroft*, 915 F. Supp. 2d 314 (E.D.N.Y. 2013) ...................................49

*Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015) ............................................... 48, 49

*United States v. Bershchansky*, 788 F.3d 102 (2d Cir. 2015).................... 28, 29, 54

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ................................................29

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ............................................30

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ...................55

*United States v. Levin*, No. 15-CR-101, 2015 WL 5602876 (S.D.N.Y. Sept. 23, 2015) ....................................................................................................................33

*United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984) .............................52

*United States v. Martin*, 426 F.3d 68 (2d Cir. 2005) ................................................31

*United States v. Matias*, 836 F.2d 744 (2d Cir. 1988) ..............................................53

*United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) ...........................................15

*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009).................................. 29, 32

*United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) ...................................................32

*United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)

................................................................................................................................33

*United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) ...................................54

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ............... 32, 34

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015) .................23

*Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994)...........................................................36

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007)..................................................... 31, 34

*Warren v. Pataki*, 823 F.3d 125 (2d Cir. 2016) .......................................... 39, 43, 52

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ....................................................................31

*Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993)..........................55

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).......................................... 26, 45, 51

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ....................................................35

## Other

U.S. Dep't of Justice, Office of Prof'l Responsibility, *Annual Report* (2014)........46

W. LaFave, *Search and Seizure* (5th ed. 2012) .......................................................30

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................... *passim*

## INTRODUCTION

This is a case about government agents fabricating evidence and, as a result, destroying a business. In November 2010, FBI and AUSA Defendants conducted an unprecedented raid on the offices of Plaintiff David Ganek, after leaking their plans to the *Wall Street Journal*. Ganek is a well-respected, established hedge fund operator who was innocent of any insider trading. Agents searched Ganek's office at Level Global, seizing his personal cell phone and searching his email and documents. As the press immediately observed—and Defendants knew in advance—the search warrants "may as well have been death warrants for the hedge funds raided." JA-38 (¶96).

Anxious to reassure his investors and save his business, Ganek commissioned an unfettered review by respected law firms which confirmed that he had not engaged in any insider trading. But because Ganek, the public face of Level Global with a controlling interest in the firm, was one of only three Level Global employees named in the search warrant (signaling that he was a focus of the government's investigation), this review could not placate his investors' concerns. Representatives of Ganek and Level Global then reached out to the AUSAs, including supervisors up to U.S. Attorney Preet Bharara himself, insisting that the government had made a mistake about Ganek, that he was innocent, and that unless the government could clarify that Ganek was not a focus of the

investigation—that is, that they did not have probable cause to believe Ganek had engaged in wrongdoing—the business would fold. Defendants refused to do so, instead saying they stood by the raid and warrant.

At the same time that Defendants publicized the raid, they took pains to make sure that its basis remained under wraps. The government did not bring any charges stemming from the raid for nearly 14 months, and never charged Ganek at all. It was not until nearly two years later, after the warrant affidavit was privately disclosed and witnesses testified under oath at the trial of others, that the truth came out.

*No* evidence had implicated Ganek. "The sole basis for probable cause to make Mr. Ganek a target of the raid was the evidence Defendants had fabricated," JA-35 (¶82)—statements attributed to one witness, Adondakis, that Adondakis *never said*. Nor was this a minor detail or a casual inadvertence. Defendants expressly asked Adondakis about Ganek and, when they did not get the answer they wanted, lied about it. But by the time that Ganek found out about the lies, it was too late. His company, Level Global, had folded, its employees had lost their jobs, and the damage to Ganek's reputation and all of Level Global's employees was complete.

The District Court correctly recognized that "[t]hese are grave allegations." JA-154. The bars on using fabricated evidence as the basis for an investigation

2

(under the Fifth Amendment), or searching without probable cause (under the Fourth Amendment), are fundamental to the integrity of the criminal justice system. As the District Court concluded, the Complaint meets Plaintiff's burden at this stage; "[d]iscovery is now appropriate to ascertain whether this case is about a simple misunderstanding [as Defendants assert] or whether something more troubling was afoot [as Plaintiff's evidence suggests]." JA-187.

Defendants now appeal in the evident hope that they will never have to defend their actions in discovery or at trial. But the arguments they raise provide no basis for the relief they seek: throwing out this case.

Defendants claim that Plaintiff has not even alleged a fabrication at all. A quick read of the Complaint disproves that. Indeed, although Plaintiff need not prove his case at this early stage, he *already* has made what the District Court termed "a substantial showing" that the fabrication did in fact occur—including the sworn testimony of the government informant and his FBI handler contradicting the allegations made in the search warrant affidavit and the FBI's written report. JA-165.

Defendants then argue that even if they knew Ganek was completely innocent, and lied about having probable cause against him, they were justified in searching and seizing his personal electronics, documents and emails, and parading this all around in the press, in search of evidence someone else may have

committed a crime. The Fourth Amendment refutes that; sweeping government searches of our most personal items are not permitted based on mere proximity to others suspected of a crime. (And, as it turns out, in this case there were no crimes at all.)

Finally, Defendants claim the supervisors should be dismissed because, pre-discovery, Plaintiff cannot fill in all the details of what happened during internal meetings within the U.S. Attorney's Office ("USAO"), and because, they claim, reasonable supervisors would not have known they had an obligation to intervene when they caught their subordinates fabricating evidence. But here again, Plaintiff's Complaint is remarkable not only for the shocking misconduct alleged, but also for the detailed allegations about the involvement of supervisors supported by their own statements.

In short, the District Court was correct to reject each of these arguments.

It is not surprising that Defendants ask this Court to protect them from having to answer for their misconduct. But what is surprising, in a case about tarnishing Ganek's reputation without basis, is that Defendants would use their papers as an opportunity to hint at *new* false allegations against him. In the face of sworn testimony from an FBI agent and the government informant clearing Ganek, Defendants make the remarkable, baseless claim that Ganek *could* have been implicated in insider trading involving some other unspecified company.

This newest smear should not shield Defendants from this suit. Rather, it only underscores how critical it is to hold these Defendants accountable. This case must proceed.

## STATEMENT OF FACTS

### A. The FBI and USAO prioritize insider trading investigations.

Insider trading investigations are extraordinarily complex because, as the Supreme Court has long recognized, there is nothing unlawful about trading on nonpublic information developed through legitimate research tools. JA-26 (¶41), JA-28 (¶43), JA-29 (¶51); *see Dirks v. S.E.C.*, 463 U.S. 646, 657 (1983) (Supreme Court cases "repudiat[e] any notion that all traders must enjoy equal information before trading."). Indeed, trading based on lawful research is what hedge funds do; this research allows quality funds like Level Global to provide a true "hedge" against market risk for institutional investors such as government retirement funds and endowments for non-profits. JA-26–28 (¶¶34–37). The FBI and USAO rely on teams of specially trained investigators to distinguish lawful trading based on nonpublic information from behavior that crosses the line. JA-28 (¶48), JA-30 (¶56–61), JA-33 (¶75).

In 2007 or 2008, top federal officials began prioritizing insider trading investigations. JA-28 (¶48). Special FBI and USAO task forces devoted to these investigations shared information and regularly communicated with high-ranking

5

supervisors including U.S. Attorney Preet Bharara. JA-21–24 (¶¶19–33) (detailing Defendants' roles in these task forces), JA-28 (¶¶48–49). In 2009, Bharara "publicized those investigations as one of his signature initiatives, noting that his Office was utilizing 'covert methods' typically reserved for violent criminal organizations," including informants, wiretaps, and evidence raids. JA-153–54 (Dist. Ct. Order); JA-28–29 (¶¶49–53). This strategy differed markedly from the USAO's prior practice of using grand jury subpoenas to investigate allegations of wrongdoing at legitimate businesses. JA-28 (¶51). The significant cost of manpower and resources for wiretaps, raids, and specialized analysis created strong incentives to produce commensurately significant prosecutions. JA-29–30 (¶¶53–54).

## B. Defendants target Ganek, but fail to obtain evidence against him.

In 2010, Bharara and his team turned their attention to Level Global, a long-established, institutional-quality investment fund. A popular choice among conservative, institutional investors, Level Global's business was routinely subject to extensive due diligence, including as recently as early 2010, when a sophisticated investor buying a passive, minority stake valued the business at over $400 million. JA-30 (¶55), JA-24–25 (¶¶34–38). As the senior partner, Ganek was the most attractive target at Level Global in an investigation seeking high-profile defendants. JA-25–26 (¶¶39–40), JA-32 (¶68), JA-33 (¶72).

By fall 2010, despite a long and expensive investigation, Defendants had *no* evidence implicating Ganek in any kind of misconduct—no wiretap, no witness, no document. JA-31 (¶¶64–65), JA-33 (¶74), JA-35 (¶84), JA-37 (¶88). This is not surprising as Ganek is innocent; he did not engage in any insider trading. JA-41 (¶107). Defendants did, however, have wiretap evidence that they believed implicated former Level Global analyst Sam Adondakis in insider trading. JA-31 (¶¶64–65). Although Adondakis no longer worked at Level Global—he had been fired months earlier for violating the company's compliance protocols—federal officials hoped that he could implicate Ganek in wrongdoing. *Id.*; JA-26 (¶42). So, in October 2010, with Chaves's knowledge and approval, FBI Defendants Hinkle and Makol met Adondakis in Central Park to gain his cooperation in the investigations of Ganek and Level Global. JA-31 (¶¶63, 66).

On November 2, 2010, AUSAs Brodsky and Leibowitz and FBI Agents Makol, Hinkle, and Komar questioned Adondakis about insider trading at Level Global, seeking information implicating Ganek, Level Global's highest-profile target. JA-38 (¶68). Adondakis admitted that he had received sensitive, nonpublic information regarding Dell. JA-38 (¶69).

Adondakis, however, "explicitly *denied* ever informing Ganek" that any Dell information "came from corporate insiders." JA-155–56 (Dist. Ct. Order) (emphasis supplied). This was crucial, because if Ganek did not know any

7

information Level Global traded on came from improper sources, then he had done

nothing wrong. At subsequent meetings, Adondakis confirmed to Defendants

Hinkle, Makol, Harris, Trask, and Brodsky that he had no knowledge of Ganek

engaging in insider trading. JA-34 (¶78). The discussions with Adondakis made

one thing clear: Ganek was *innocent*—he had not engaged in any insider trading,

not on Dell or any other company. JA-17 (¶4), JA-41 (¶¶107–09), JA-42 (¶112),

JA-46 (¶136).

Given Ganek's high profile and the emphasis in the USAO on prosecuting

high-level executives, the complete lack of evidence against Ganek would have

been discussed immediately after the Adondakis meetings, both among those in the

room, and with their supervisors—Defendants Berger, Garcia, Zabel, Johnson,

Bharara, Chaves, Carroll, Rojas, and Rodriguez (hereinafter "the Supervisor

Defendants"). JA-33 (¶¶72, 75), JA-34 (¶77).

## C. With no evidence, Defendants move forward with their search of Ganek.

"On November 19, 2010…the *Wall Street Journal* reported that federal

insider-trading charges against financial professionals were imminent." JA-156

(Dist. Ct. Order). In reality, Defendants were not close to making arrests or

bringing charges against anyone at Level Global, and would not do so for 14

months. JA-37–38 (¶93). After the publication of the *Journal* article, Defendants

decided to conduct a high-profile raid of targets including Ganek, despite the lack

8

of any true evidence implicating him. JA-19 (¶10).

Although Ganek was the first target listed, and his name was repeated throughout the affidavit in support of the search warrant, only one allegation in the 38-page Affidavit implicated him in misconduct. JA-75–106. This generic allegation—that, during the November 2 meeting, Adondakis told Defendants that he had "informed [Ganek]…of the sources of the Inside Information," JA-36 (¶85 n.1) (quoting Affidavit ¶¶11, 13)—was not only false, it was fabricated by Defendants. JA-33 (¶76), JA-34 (¶79), JA-35 (¶¶83, 84), JA-37 (¶88).

Consistent with USAO and FBI practices, the Affidavit would have been reviewed not only by Trask (who signed it) but also by the Defendants present at the November 2 meeting: Brodsky, Leibowitz, Makol, Hinkle, and Komar. JA-35 (¶83). Moreover, consistent with those practices, the Supervisor Defendants would have approved the raid and been responsible for making certain that it was lawful, including by verifying the veracity of any allegation. *Id.* In short, as the District Court found, "it is plausible that some of the Supervisor Defendants would have learned details of the November 2, 2010 Meeting and, at the very least, entertained serious doubts as to the truth of the allegations in the Affidavit." JA-185–86 (internal quotation marks and alteration omitted.)

On Sunday, November 21, Defendant Trask applied to a magistrate judge for a search warrant. JA-37 (¶¶89–90). Without knowing that the evidence attributed

9

to Adondakis was false and fabricated by Defendants, the magistrate judge authorized the warrant in full, including the search and seizure of Ganek's personal office, years of financial records, letters, correspondence, photographs, address book, telephone records, and cell phones for any information involving the trading of public companies—information which comprised all of Ganek's lawful work at Level Global. JA-37 (¶¶90–91), JA-73 (warrant).

### D. Based on Defendants' fabrications, the FBI and USAO raid Ganek's Level Global offices.

On Monday, November 22, roughly two dozen FBI and USAO officials raided Level Global's midtown Manhattan offices. JA-37 (¶¶89–92). They searched Ganek's office, files, and electronic devices, and made an electronic copy of his personal cell phone. JA-40 (¶105).

The decision to stage a raid—a tactic rarely (if ever) used against a financial fund without simultaneous criminal charges—was made by the Supervisor Defendants. JA-37–38 (¶¶92–94). No exigent circumstances justified this public search rather than a typical subpoena, which Defendants also served on Level Global that same day; absolutely no information suggested that anyone at Level Global intended to destroy files or obstruct justice. JA-39 (¶102). Although the search warrant affidavit described a confidential source relaying a supervisor's instructions to destroy evidence, JA-105 (¶17), Defendants concede in their brief this allegation concerned a hedge fund *unrelated* to Level Global. Defs.' Br. at 6–

10

7. Indeed, Defendants never used evidence obtained from the raid in any proceeding, instead relying solely on documents produced by Level Global under subpoena. JA-55 (¶168).

The true purpose of the raid was to garner press attention. "Prior to executing the warrant, the Government alerted the *Wall Street Journal* that it would be raiding Level Global's offices." JA-157 (Dist. Ct. Order). Because it had been tipped off, the *Journal* "was able to publish photographs of FBI agents carrying boxes of documents from Level Global's office." *Id.* The order to contact the newspaper must have come from above because "[o]nly the Supervisor Defendants had the authority to alert the media." *Id.* Defendants chose to conduct a raid and to tell the media in order to maximize the harm to Ganek and Level Global, all the while that the affidavit in support of the search warrant remained sealed. JA-39–40 (¶¶99–104). And it worked: "These raids sent shockwaves through Wall Street." JA-153 (Dist. Ct. Order).

## E. Defendants repeatedly refuse to take any action to mitigate the effects of their misconduct.

Ganek knew he was innocent of any wrongdoing, and so, after the raid, he hired well-respected outside counsel to perform a thorough, unfettered review of Level Global. JA-40–41 (¶¶106–09). This review confirmed he had not engaged in any insider trading. JA-42 (¶112).

Level Global's sophisticated investors sought assurances that Ganek, as the

11

principal of the fund, was not personally accused of wrongdoing. JA-42 (¶¶113–14). If Ganek could clear his personal reputation, he could still prevent Level Global from folding. *Id.* But Ganek could not give these assurances because he had been a target of the raid—he was one of only three people at Level Global whose personal offices, papers, electronics and cell phones were searched and seized. JA-43 (¶¶116–18). Because the Affidavit was sealed, he could not challenge any allegation made against him. JA-43 (¶115).

Ganek reached out to Defendants in an effort to mitigate the damage done to him. First, on December 20, 2010, Level Global representatives met with USAO representatives, including Defendants Zabel and Leibowitz, and expressed concerns about the damage the raid and investigation were doing to Level Global. But "Zabel and Leibowitz informed Level Global that the likely commercial consequences of the raid 'had been carefully considered at the highest levels' before it was initiated." JA-157 (Dist. Ct. Order).

Later, on February 4, 2011, a Level Global attorney and highly respected former federal prosecutor contacted Bharara, whom he knew personally, to discuss the damage done to Ganek and Level Global. JA-18 (¶7), JA-43 (¶¶119–20). This attorney told Bharara, in substance, that the search had unnerved investors and "that Level Global would close if the Government failed to clarify publicly that Ganek was not a target of the insider trading investigation. JA-158 (Dist. Ct.

12

Order); JA-18 (¶7), JA-43 (¶¶120–21). Bharara agreed to look into the matter and, three days later, told the Level Global Attorney "that he had consulted with his team," JA-19 (¶8), JA-44 (¶123), and that they "understood that Level Global might be forced to close its doors," but "he would not intervene." JA-158 (Dist. Ct. Order).

Not only did Defendants fail to come clean about the lie in the warrant, they doubled down on their false accusations. JA-46 (¶134). On February 3, 2011, one or more of the FBI Defendants drafted a report purporting to recount the Adondakis meeting of November 2, 2010. "The Report reiterated the fabricated information" that Adondakis told the agents that Ganek was interested in the Dell information "*because the information came directly from contacts at Dell*." JA-158 (Dist. Ct. Order) (emphasis in original).

On February 11, 2011, Ganek was forced to begin to wind down Level Global, resulting in lost employment for dozens of employees and financial losses for investors. JA-45 (¶128), JA-46 (¶135). After the press publicized that Level Global intended to close by March 31, AUSA Defendant Leibowitz and other federal agents arranged to meet with Adondakis to discuss Ganek. JA-45 (¶129). "At the February 11, 2011 meeting, Adondakis reiterated that he never informed Ganek about his sources." JA-158 (Dist. Ct. Order). In other words, the meeting confirmed what Defendants already knew—that the Affidavit's allegation

13

implicating Ganek in insider trading was false and fabricated. JA-45 (¶¶130–31), JA-46 (¶133). These facts, including Adondakis's renewed repudiation of allegations against Ganek, were relayed to the Supervisor Defendants, who again took no action. JA-46 (¶132).

## F.  Defendants' misconduct comes to light at the *Newman* trial.

Adondakis was not indicted until April 2011, and his indictment unsealed on January 18, 2012—the same date that Defendant Bharara publicly announced that several individuals were being charged with related crimes. JA-46–47 (¶¶135–38). Ganek "was not mentioned—much less indicted—in connection with any of the charges." JA-159 (Dist. Ct. Order).

In November 2012, Chiasson and Newman (a defendant from a separate hedge fund) proceeded to trial. JA-47 (¶141). It was during this trial that Defendants' fabrications first came to light. On *direct* examination by the Government, Adondakis testified that he "never" told Ganek about a source within Dell. JA-47 (¶142). Adondakis went further on cross examination:

> Q. Let's refer to Mr. Ganek specifically. I'd like to read [from the subsequently created report of the November 2, 2010 meeting], if I may. "Chiasson and Ganek were both interested in the Dell information when Adondakis told them because the information came directly from contacts at Dell." Is that true as to Mr. Ganek or not true?
>
> A. *No, it's not true.*

14

JA-48 (¶143). A few days later, Defendant Makol, who had been present for the November 2, 2010 meeting with Adondakis, "corroborated Adondakis's trial testimony, and disclaimed responsibility for the…contents [of the Report purporting to summarize the November proffer]." JA-159 (Dist. Ct. Order). He testified that he "was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell." JA-48–49 (¶144). In sum, the sworn trial testimony directly contradicted the fabrication contained in the Affidavit and repeated in the subsequent report. JA-49 (¶145).

On December 10, 2014, this Court overturned the jury's guilty verdict, and vacated the convictions of both defendants. *See United States v. Newman*, 773 F.3d 438, 453 (2d Cir. 2014), *cert. denied*, 136 S.Ct. 242 (Oct. 5, 2015) ("[T]he Government presented absolutely no testimony or any other evidence that Newman and Chiasson knew that they were trading on information obtained from insiders, or that those insiders received any benefit in exchange for such disclosures, or even that Newman and Chiasson consciously avoided learning of these facts."). This Court concluded that "the bare facts in support of the Government's theory of the case are as consistent with an inference of innocence as one of guilt." *Id.* at 455. Based on the *Newman* decision, the Government moved to vacate Adondakis's guilty plea. *United States v. Adondakis*, No. 11-cr-00360 (S.D.N.Y.), Dkt. # 17.

15

Subsequently, "in a nearly unprecedented role-reversal, the SEC agreed to disgorge monies it collected in connection with consent judgments against various hedge funds, including Level Global." JA-153 (Dist. Ct. Order).

In sum, Defendants fabricated evidence against Ganek to try to connect him to others at Level Global they suspected of insider trading. But not only could they not legitimately link Ganek to the others' activity, it turns out that the others had not committed insider trading in the first place.

## G. The District Court rejects Defendants' attempt to dismiss the suit.

Ganek filed his Complaint in February 2015, alleging that the non-supervisor Defendants' deliberate misrepresentations violated his Fourth and Fifth Amendment rights, that all Defendants are liable for their failure to intercede, and that the Supervisor Defendants are liable based on their personal involvement in their role as supervisors. JA-16–61.

Defendants moved to dismiss the suit in its entirety.

After reviewing 117 pages of briefing and hearing oral argument, the District Court issued a 35-page decision examining each argument Defendants raised and denying Defendants' motion in large part. The District Court determined that Ganek had adequately pled (1) "that the seizure of his personal items was premised on fabricated evidence," in violation of his Fifth Amendment rights, JA-166–65, 170–76; and (2) that Defendants lacked probable cause to

16

support the search and seizure of Ganek's property, in violation of Ganek's Fourth Amendment rights, JA 164–67. And the District Court recognized that failure to intercede claims could properly impose liability on non-Supervisor Defendants who "had a realistic opportunity to intervene before the Affidavit was submitted to the magistrate." JA-179. However, the District Court dismissed several other theories of liability, including a stigma-plus theory of Fifth Amendment liability, and a challenge to the reasonableness of the manner of the search under the Fourth Amendment. JA-167–70, 172–74.

The District Court also declined to dismiss the claims against the Supervisors. It recognized that supervisors may not be held vicariously liable, and thus that the Complaint had to "plausibly plead that the Supervisor Defendants acted 'deliberately or recklessly' with regard to the fabricated evidence against Ganek." JA-183. But the Court found that high bar had been met based on the allegations of "specific facts establishing the plausibility of the Supervisor Defendants' involvement prior to the raid." JA-185. And the District Court acknowledged the plausible allegations that if the Supervisors "had learned—prior to Level Global's closure—that the search of Ganek's office had been predicated on false evidence" they could have "prevented a significant amount of the harm" Ganek suffered. JA-181–82. The District Court also noted it intended to prevent any undue burden on the Supervisor Defendants through an "equitable and

17

proportional discovery plan." JA-186.

The District Court concluded "[d]iscovery is now appropriate to ascertain whether this case is about a simple misunderstanding or whether something more troubling was afoot." JA-187. Instead, this appeal followed.

## SUMMARY OF ARGUMENT

Defendants provide no basis to disturb the District Court's ruling.

Defendants' convoluted argument that Plaintiff does not allege a fabrication is difficult even to follow. The Complaint could not be clearer that (1) no evidence implicated Ganek in any insider trading; (2) Defendants knew there was no evidence implicating Ganek; and (3) the statement in the warrant claiming Adondakis *did* implicate Ganek was fabricated. And the law could not be clearer that those allegations must be credited at this stage.

Plaintiff's Fifth Amendment claim follows directly from that fabrication. Defendants barely address this claim at all, not even attempting an independent argument for why it should be dismissed.

Plaintiff's Fourth Amendment claim also must go forward. An affidavit correcting the misstatement—making plain not only that the government had no evidence implicating Ganek in insider trading, but also that their own star witness exonerated him—does not come close to supporting the broad and sweeping search of Ganek's personal effects that the government performed. Indeed, had

18

Defendants actually believed a magistrate would authorize the warrant knowing the true facts, there would have been no reason to fabricate evidence in the first place.

Defendants' rote invocation of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is misplaced; no one has argued the Supervisors should be liable under *respondeat superior*. Rather, as the District Court found, Plaintiff's claims against the Supervisors have extraordinary factual support for this stage, including "specific facts establishing the plausibility" of the Supervisors' culpable involvement. JA-185. And the District Court correctly recognized that reasonable supervisors would understand they could not turn a blind eye to their subordinates' fabrication of evidence.

The District Court's decision should be affirmed.

## LEGAL STANDARDS

### A. On a motion to dismiss, the complaint's allegations must be accepted as true.

A Rule 12(b)(6) motion may not be granted if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed

'*on the assumption that all the [factual] allegations in the complaint are true*,'"

"[e]ven if their truth seems doubtful." *Anderson News, L.L.C. v. Am. Media, Inc.*,

680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that

the plausibility requirement *does not* impose a *probability* requirement at the

pleading stage,…a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of the facts alleged is improbable, and that a recovery is

very remote and unlikely." *Id.* (internal quotation marks omitted) (quoting

*Twombly*, 550 U.S. at 556).

　　　The Court must "construe plaintiffs' complaint liberally, accepting all

factual allegations in the complaint as true, and drawing all reasonable inferences

in plaintiffs' favor," *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)

(quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009), including facts

alleged on information and belief when those facts are "peculiarly within the

possession and control of the defendant, or where the belief is based on factual

information that makes the inference of culpability plausible." *Arista*, 604 F.3d at

120 (citation omitted); *see also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71

(2d Cir. 2014). Direct evidence of a defendant's intent, motive, or knowledge is

rarely available to plaintiffs before discovery, and "[i]t is sufficient to allege facts

from which [the relevant mental state] on the part of the defendants *reasonably*

*may be inferred*." *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851,

20

857 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002)). In sum, a complaint must plead factual allegations "sufficient to raise a reasonable expectation that discovery is likely to generate evidence of liability." *Keiler*, 751 F.3d at 71 (citing *Twombly*, 550 U.S. at 545).

## B. Qualified immunity may rarely be decided on a motion to dismiss.

"[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). In particular, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id*. For these reasons, a qualified immunity defense presented in a Rule 12(b)(6) motion "faces a formidable hurdle…and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (internal quotation marks omitted) (quoting *McKenna*, 386 F.3d at 434).

## ARGUMENT

**I.     The District Court correctly held Plaintiff alleges viable claims against the individual Defendants.**

### A. The only allegations implicating Ganek in insider trading were Defendants' fabrications.

Defendants' primary argument for dismissal is that they did nothing wrong: "Contrary to Ganek's allegations, the search warrant affidavit contained no misrepresentations." Defs.' Br. at 2. But Plaintiff alleges it did, *see* JA-164–65 (Dist. Ct. Order), and at the pleadings stage, the Court must accept Plaintiff's well-pleaded allegations as true; Defendants are not free to dispute them. *Selevan*, 584 F.3d at 88. Defendants thus engage in gymnastics to try to turn Plaintiff's allegations inside out, arguing that, for example, the allegation "[t]he fabricated inculpatory statements against Mr. Ganek were the only basis for Defendants to include Mr. Ganek as a target of the raid," JA-37 (¶88), should be read as if Plaintiff is not alleging fabrication at all. As the District Court noted: "This argument misses the mark." JA-165.

The Complaint could not have been clearer that Adondakis *never* implicated Ganek in any insider trading—with respect to *any* company—yet Defendants falsely reported that he did:

> As Defendants knew, Adondakis *never* said that he had informed Mr. Ganek that he was providing him inside information and *never* said that he had informed Mr. Ganek about the source of the information he was providing. In fact, Mr. Adondakis had told Defendants the

22

opposite: *that he had never told Mr. Ganek the source of the information he provided*.

JA-36 (¶86) (emphasis added); *see also* JA-33 (¶73), JA-34 (¶78), JA-47 (¶141). This allegation is supported, among other things, by the fact the government, despite its vast resources and interest in Ganek, never obtained any evidence implicating Ganek during the months of investigation prior to the raid, JA-31 (¶¶64–65), 33 (¶74), 35 (¶84), 37 (¶88), as well as that Ganek never actually committed insider trading, JA-17 (¶4), 41 (¶¶107–09), 42 (¶112), 46 (¶136). And as is plain from the affidavit and the Complaint, Adondakis is the only source the Government even claimed implicated Ganek. *See* JA-98 (¶13c) (affidavit), JA-99 (¶13e) (affidavit), JA-37 (¶88) (Compl.).

Plaintiff's allegation is also supported by sworn testimony from both Adondakis and Defendant Makol that the sole allegation against Ganek—as documented in the FBI report purporting to memorialize the November 2 meeting—is false. JA-47–49 (¶¶142–45). That Ganek already has *any* sworn testimony proving a fabrication at all, at this early stage of litigation, is extraordinary; no such evidentiary support is required at the pleadings stage. *See, e.g.*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 n.8 (2d Cir. 2015) ("Of course, at the pleading stage, Vega was not required to 'demonstrate' or 'establish' discrimination; he was required only to *plead* a claim upon which relief could be granted."); *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) ("In

23

ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010))).[1]

But this is where Defendants begin their convoluted path. They glom onto a perceived mismatch between the wording of the search warrant affidavit (which refers to broadly defined "Inside Information") and the trial testimony (which discusses information regarding Dell). Next they hypothesize that Adondakis *could* have reported that he had informed Ganek of "the source of Inside Information about at least one *other* public company," and that the Complaint "offers nothing to dispute this point." Defs.' Br. at 26 (emphasis added). Thus, they conclude that the Complaint has not "adequately alleged" any fabrication at all. *Id*.

There are several fatal problems with this argument. First, the Complaint *does* "dispute this point." It alleges broadly that Adondakis never implicated Ganek in insider trading at all, with respect to any company. JA-32 (¶70), JA-33 (¶73), JA-34 (¶78). It also asserts specifically that the fabrication in the search

---

[1] Although this testimony, alone, is enough to support Plaintiff's allegations, Plaintiff has additional evidentiary support for his good faith allegations of misconduct—some identified in the Complaint, and some not. The District Court noted that although Plaintiff is *not* required to make "a substantial showing of a false statement," it would find Plaintiff's evidence met that heightened burden it if applied. JA-165 n.7.

warrant affidavit was based on the lie that Adondakis had implicated Ganek *with respect to Dell*. JA-33 (¶76).

Defendants are not free to hypothesize new facts; on their motion to dismiss "the only facts to be considered are those alleged in the complaint, and the court must accept them." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).[2] And even if the allegations in the Complaint were ambiguous—they are not—the Court must "construe ambiguities in the light most favorable to upholding the plaintiff's claim." *Id.*

Second, Defendants' hypothetical argument is belied by the record. Prior to the raid, only the November 2 meeting with Adondakis discussed Ganek in substance. JA-32 (¶68), JA-33 (¶¶73–74), JA-34 (¶78), JA-35 (¶84), JA-36 (¶87). Dell was *the* key security and the only security used as a search term when searching Level Global's servers. *See* JA-33 (¶76), JA-115 (affidavit) (listing "Dell" as the only security or stock to be used as a search term)). There is no basis to assert Adondakis might have implicated Ganek with respect to a different company. As the Complaint pleads, he did not. JA-32 (¶70), JA-33 (¶¶72–73), JA-

---

[2] Defendants' error may stem from a misapprehension that allegations in the search warrant affidavit should be taken as true unless they are specifically disproven by the Complaint. Not so. While the Court may examine documents like the search warrant affidavit that are considered incorporated by reference into the Complaint, "the court is to consider [these documents] on a Rule 12(b)(6) motion only to determine *what* the documents stated, and *not to prove the truth of their contents*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks and citation omitted).

34 (¶78). Indeed, it is troubling, to say the least, that in a case seeking to hold Defendants to account for making false allegations against Ganek, their brief unfairly insinuates insider trading with respect to unnamed companies.

### B. Defendants provide no basis to dismiss Ganek's Fifth Amendment due process claim.

Defendants relegate to one paragraph their challenge to the District Court's decision validating Plaintiff's core due process claim—that Ganek was unlawfully deprived of property (primarily his business, Level Global) based on Defendants' "manufacture of false evidence." *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000). The District Court's decision was correct; Defendants' scant response does not come close to providing a basis to reverse it.[3]

As this Court has explained, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Zahrey*, 221 F.3d at 355–57 (holding same standard applies to prosecutors acting in an investigative capacity); *Morse v. Fusto*, 804

---

[3] Should Defendants seek to augment these arguments in reply, it would be too late. *See JP Morgan Chase Bank v. Altos Hornos de Mex.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

F.3d 538, 546–48 (2d Cir. 2015) (same).

The District Court recognized that that is precisely what Plaintiff alleges here: that Defendants fabricated evidence suggesting Ganek had engaged in insider trading, and used that fabricated evidence to falsely implicate him, foreseeably causing the destruction of his business. JA-170–71, 175–76.

Such a fabrication claim is independent of any Fourth Amendment claim, and may be pursued whether or not there was probable cause. *See Ricciuti*, 124 F.3d at 130–31 (rejecting argument that, so long as there is probable cause, officers could fabricate evidence against suspect, holding that would "make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice"); *Morse*, 804 F.3d at 543, 550 (affirming jury verdict against investigator and prosecutor who fabricated evidence against dentist, causing loss of his business, even though malicious prosecution claim was dismissed because there was probable cause against him).

Thus the plausible allegations of fabrication, detailed above, are enough to require that this case proceed to discovery.

### C. Defendants' search of Ganek's office, personal electronic devices, and emails without probable cause violated the Fourth Amendment.

The District Court also found Ganek had stated a Fourth Amendment claim. It rejected Defendants' argument that "probable cause existed to search all of Ganek's personal devices and emails stored at his office—treating him as if he

27

were directly implicated in an insider trading scandal—even though the Government's sole witness disclaimed that Ganek was aware of the source of the Inside Information." JA-166–67. As Defendants concede, the District Court applied the correct standard by evaluating whether a hypothetical affidavit recounting the true facts would have supplied probable cause. *See* Defs.' Br. at 26; *see also* JA-165–66 (Dist. Ct. Order) (citing *Southerland v. City of New York*, 680 F.3d 127, 143–44 (2d Cir. 2012)).

In this case, "the hypothetical 'corrected affidavit' would not only excise the allegedly false material—references to Ganek being informed of the sources of the inside information—it would 'supply any omitted information'—that when Adondakis met with Defendants at the November 2, 2010 Meeting, he specifically informed them that he never told Ganek his sources." JA-166 (Dist. Ct. Order) (citing Compl. ¶86); *see also McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014). As the District Court held, this key difference—Ganek was innocent, not guilty—would certainly "bear on the 'totality of the circumstances' on which the magistrate assessed probable cause and the breadth of the warrant." JA-167 (quoting *McColley*, 740 F.3d at 824). Defendants' argument to the contrary has no more heft on appeal than it did below.

"Search warrant procedures are not mere formalities." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015). A warrant must "describe with

particularity the place to be searched and the items to be seized." *Id*. (citing

*Kentucky v. King*, 563 U.S. 452 (2011)). Moreover, even where a warrant

particularly describes the place to be search, "[a] different particularity

concern…arises as to whether the breadth of that description outruns the probable

cause supporting the warrant." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir.

2011). "By limiting the authorization to search to the specific areas and things for

which there is probable cause to search, the [particularity] requirement ensures that

the search will be carefully tailored to its justifications, and will not take on the

character of the wide-ranging exploratory searches the Framers intended to

prohibit." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 99 (2d Cir. 2016)

(quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)); *see also United States v.*

*Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the

personal computer and its ability to store and intermingle a huge array of one's

personal papers in a single place increases law enforcement's ability to conduct a

wide-ranging search into a person's private affairs, and accordingly makes the

particularity requirement that much more important.").

Under these principles, it is critical to understand the extraordinary breadth

of the search and seizure that Defendants seek to justify, for "[a]n otherwise

unobjectionable description of the objects to be seized is defective if it is broader

than can be justified by the probable cause upon which the warrant is based."

*United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting 2 W. LaFave,

*Search and Seizure* § 4.6(a) (5th ed. 2012)).

The warrant permitted the search of Ganek's personal office, including "[a]ll

financial records, handwritten documents and/or notebooks, letters and

correspondence, photographs, telephone and address books, identification

documents, travel documents, telephone records, computers and other electronic

devices, cellular telephones." JA-70. Among these items, the warrant authorized

the seizure of "[a]ny and all documents relating to, reflecting, and/or concerning

*information about public companies*" and "[a]ny and all evidence reflecting

*communications about trading based on information about public companies*." JA-

73 (emphasis added). Given that Level Global's lawful business is to gather

information about public companies and then trade on it, this would encompass

essentially all documents in his office. *See* JA-24–27 (¶¶34–46). The warrant also

authorized a mirroring of Level Global's server and a search for all emails and

documents authored by, sent to, and/or received from Ganek without any time

limitations. JA-72.

In these respects (the search of his office, seizure of his documents, and

search of all of his emails and electronic documents) Ganek was treated identically

to the two people at Level Global for whom there were specific (albeit, it turns out,

incorrect) allegations of insider trading—and unlike any other person working at

Level Global.[4] As the District Court noted, the authorized search sought "evidence *from 'participants* in fraudulent schemes' and treat[ed] Ganek just like those individuals identified by Adondakis as having known the sources of the Inside Information." JA-166 (emphasis added) (citing affidavit ¶¶19–20)). But the law is clear that "probable cause to search must be based on particularized information about the place to be searched, not simply on a target's 'mere propinquity to others independently suspected of criminal activity.'" *Walczyk v. Rio*, 496 F.3d 139, 1663 (2d Cir. 2007) (quoting *United States v. Martin*, 426 F.3d 68, 81 (2d Cir. 2005)); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (explaining that the Fourth Amendment's warrant requirement serves to ensure that "those searches deemed necessary should be as limited as possible").

---

[4] It is ironic that Defendants attempt to use the fact that their investigation was at a "preliminary stage" to justify their allegations against Ganek. Defs.' Br. at 21. One would hope that the FBI and the USAO would not physically raid a legitimate business, full-well knowing the devastating impact of such a raid, when their investigation was only at a "preliminary stage." *See* JA-40 (¶104) (quoting U.S. Attorney Bharara's statement that "prosecutors in my office…[are] trained to make sure that [they] don't do undue damage" and to understand that damage can occur "even from the mere opening of an investigation")). Moreover, the broad definition of the term "Inside Information"—and the generic nature of the allegations against Ganek—do not help Defendants. The allegations against every other individual discussed in the warrant refer to specific trades and specific securities. The failure to include any specificity with respect to Ganek appears to be calculated cover for an illegal search, since the only allegation implicating Ganek was fabricated.

Yet Defendants contend that even had they told the magistrate the truth—
that they had no evidence implicating Ganek in insider trading—the magistrate still
would have authorized this sweeping search and seizure of his personal documents
(photographs, address books, identification documents, travel documents);
personal electronics (computers, cellular phones, and other electronic devices); and
communications (emails and other communications on his phone, computer, and
the Level Global Server). The District Court found this argument particularly
"unpersuasive" given the "amount of personal information such a search would
likely ensnare." JA-167.[5]

Tellingly, Defendants point to no decisions authorizing such an expansive
warrant in like circumstances. Nor has Plaintiff's research uncovered any. Instead,
courts have found warrants overbroad where they permit the search of offices or an
individual's possessions where the office or individual is not implicated in the
wrongdoing under investigation. *See, e.g.*, *United States v. Zemlyansky*, 945 F.
Supp. 2d 438, 458–59 (S.D.N.Y. 2013) (finding warrant to search a billing office,

---

[5] The District Court's concern about the extent of intrusion caused by a search of
personal electronic information echoes a persistent theme in recent Fourth
Amendment law. *See, e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2489 (2014)
(explaining that cellphones have "immense storage capacity" that may contain
"every piece of mail [people] have received for the past several months, every
picture they have taken, or every book or article they have read," which can allow
the "sum of an individual's private life [to] be reconstructed"); *United States v.
Rosa*, 626 F.3d 56, 62 (2d Cir. 2010) (explaining that the particularity requirement
is "much more important" when a warrant allows for the search of electronics)
(quoting *Otero*, 563 F.3d at 1132).

which had been used by defendants accused of running an insurance fraud scheme through five medical clinics, was "impermissibly broad" where the warrant allowed the seizure of essentially all of the billing office's paper and electronic documents even if not "related to the five modality clinics at the center of the alleged conspiracy in question" or the "particular suspects in the case," including any cellphone at the business whether of "target subjects, unwitting employees, or innocent customers"); *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *20 (S.D.N.Y. Apr. 4, 2007) (finding search of investment office in investigation concerning "three allegedly misused investment funds" which totaled "approximately $25 million" of the office's "$1.2 billion in assets," was overbroad where the search contained no time limitation and extended to "*all* client files, *all* investment advisory agreements, and *all* documents concerning communications with…clients," despite the fact that there was "no probable cause indicating that Defendants did anything illegal" with funds and clients other than three target funds); *cf. United States v. Levin*, No. 15-CR-101, 2015 WL 5602876, at *8 (S.D.N.Y. Sept. 23, 2015) (finding corrected affidavit provided probable cause to search a particular individual's office within larger business premises because the affidavit still established probable cause to believe the occupant of the office knowingly participated in the fraudulent scheme under investigation).

Any holding otherwise would eviscerate the "all records" doctrine, which holds that the government may only conduct a pervasive search of an entire business "[w]hen the criminal activity pervades that entire business." *U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989) (internal citation omitted); *see also Zemlyansky*, 945 F. Supp. 2d at 461 ("In cases where the all records exception has been applied, the affidavit submitted in support of the warrant contained detailed information that would provide reason to believe that all or nearly all of the business under investigation was illegal.").

But Defendants do not (and cannot) contend that Level Global was a business pervaded by fraud. Instead, the Government seeks to make an end-run around this standard by claiming that the suspected criminal activity of a few employees would have justified an absolute and complete rummaging search of anyone who interacted with them.[6]

The warrant affidavit did not make an argument how a search of Ganek's travel documents, photographs, address book and identification documents could

---

[6] Absent any evidence specific to Ganek, the stale nature of the information of the warrant would have likely played an even bigger role in the magistrate's assessment. *See Walczyk*, 496 F.3d at 162 ("In evaluating probable cause, a magistrate is always required to consider whether the facts adduced in the warrant application 'appear[ ] to be current, *i.e.*, true at the time of the application,' or whether they have 'become stale.'") (internal citation omitted). In this case, the magistrate would have seen an affidavit relying primarily on Adondakis, whose wiretaps and trades were nearly a year old and who had not worked at Level Global for approximately six months.

possibly be necessary to show unwitting participation in Adondakis's crime. To the contrary, it met the particularity requirement based on the assertion that "participants in fraudulent schemes" are known to leave evidence in the places to be searched; it said nothing about the personal effects of innocent co-workers. JA-107 (¶¶19–20) (affidavit). The same is true for the seizure of Ganek's personal electronics and wide-ranging search of years of his documents and emails. There is no basis given for why this exhaustive search, foraging through all of his files— rather than the key-word search done on the emails and documents of all other Level Global employees—would have been necessary or justified assuming Ganek was believed only to be an unwitting participant in others' alleged crimes. Thus this is nothing like *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), where the government conducted a targeted search for particular evidence reasonably believed to be housed at the innocent paper (photographs revealing the identities of people who had assaulted an officer). And this is important because a narrower search that made clear Ganek was not a target of the investigation would have been enough to save the business. *See* JA-42–43 (¶¶114–18).[7]

---

[7] The Court need not address Defendants' argument that a more limited search could not have averted the harm to Level Global, Defs.' Br. at 34, as it is forfeited for failure to advance it before the District Court. *See, e.g.*, *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 120 (2d Cir. 2012). In any event, it is incorrect. As the Complaint states, Level Global's sophisticated investors could distinguish between a search of the principal for evidence implicating other employees and one indicating Ganek himself was a target of the USAO. JA-42–43 (¶¶114–18).

Furthermore, Defendants' qualified immunity argument ignores that evaluating a "corrected affidavit" for probable cause is a mixed question of law and fact: while the relevance of the corrected information is a legal question, "the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *McColley*, 740 F.3d at 823 (quoting *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994)); *see also* JA-166–67 (Dist. Ct. Order). In other words, applying the "corrected affidavit" doctrine does not involve "review[ing] a magistrate's prior determination of probable cause, but rather try[ing] to predict whether a magistrate would have found probable cause if he had been presented with truthful information"—which "is a question of fact." *Velardi*, 40 F.3d at 574 n.1.

Because this Court may not decide such factual questions against Plaintiff on Defendants' motion to dismiss, *Columbia Univ.*, 831 F.3d at 48, Defendants' motion must be denied at this stage. *See McColley*, 740 F.3d at 825 (rejecting qualified immunity appeal at summary judgment based on factual dispute over "exact weight that the judge would have given" corrected information in search warrant affidavit); *see also Southerland*, 680 F.3d at 144 ("[A] court may grant summary judgment to a defendant based on qualified immunity only if the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine

36

dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits.") (internal citation and quotation omitted). Defendants cannot reasonably contend as a matter of law the magistrate would have granted the sweeping search warrant anyway, despite the fact that absolutely no evidence implicated Ganek.

Defendants focus instead on an alternate framing of the qualified immunity question: whether there was arguable probable cause. But Defendants misstate the test, improperly adding an extra layer of deference. "Arguable probable cause exists if…it was objectively reasonable for the officer to believe that probable cause existed," *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012), not if "a reasonable officer [would] belie[ve] that…at least *arguable* probable cause existed," Defs.' Br. at 26 (emphasis added).

And this "test is not toothless…: If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Ackerson*, 702 F.3d at 21 (internal citation and quotation omitted). Thus in *Ackerson*, this Court reversed a grant of summary judgment for the defendant officers because the facts known to them lacked a "crucial element" and as a result did "not arguably satisfy the elements of any crime." *Id.* Here, not only did the search warrant affidavit not articulate how the sweeping search of Ganek's

37

personal documents and communications would be appropriate absent any evidence implicating him in insider trading, Defendants *still* fail to articulate that in their brief. In other words, there is not even arguably probable cause for the search of Ganek, and Defendants are not entitled to qualified immunity.[8]

Finally, qualified immunity is inappropriate, in any event, based on the Complaint's more than plausible allegations of Defendants' intentional fabrication of material facts: "Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." *Golino v. City of New Haven*, 950 F.2d 864, 871 (2nd Cir. 1991) (citations omitted).

## II. The District Court correctly held that Ganek plausibly alleged culpable involvement by the Supervisors.

Next, Defendants object to the District Court's ruling that the supervisory claims could proceed to limited discovery. They do not dispute that supervisors may be held liable in theory, they merely challenge the sufficiency of the factual allegations. Given the plausible allegations that the individual Defendants violated

---

[8] Both of these qualified immunity formulations "find strong support" in this Court's cases. *See McColley*, 740 F.3d at 826–27 (Calabresi, J., concurring). But the Court need not address this divide here, as Defendants are not entitled to qualified immunity under either test.

Ganek's Fourth and Fifth Amendment rights by fabricating evidence against him,

the lone question is whether the Complaint plausibly pleads the personal

involvement of the Supervisors in this misconduct.

> A plaintiff may establish such personal involvement by making any one of five showings (the "*Colon* factors"):
> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58

F.3d 865, 873 (2d Cir. 1995)).

There is no dispute that the District Court held Plaintiff to at least this

standard: "Ganek must plausibly plead that the Supervisor Defendants acted

'deliberately or recklessly' with regard to the fabricated evidence against Ganek."

JA-182–83. The District Court correctly found Plaintiff's detailed allegations

"include specific facts establishing the plausibility of the Supervisor Defendants'

involvement prior to the raid, including admissions by certain defendants that the

raid's consequences 'had been carefully considered at the highest levels,' and DOJ

policy indicating that any decision to tip the press required supervisory approval."

*Id.* at JA-185 (citing Compl. ¶¶52, 54, 62, 97, 110). Yet again, Defendants provide no basis to disturb the District Court's ruling.

In an attempt to make Plaintiff's Complaint look insufficient, Defendants minimize each individual allegation and then consider whether that allegation, alone, proves supervisory involvement in the misconduct. That approach combines several errors. First, the Court may not minimize the allegations as Defendants suggest, but instead must "construe plaintiff['s] complaint liberally…drawing all reasonable inferences in plaintiff['s] favor." *Selevan*, 584 F.3d at 88 (quotation omitted). Second, the plausibility of Plaintiff's claim must be considered based on the "complaint as a whole." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) ("[A]llegations about the defendant's knowledge, intent, and actions should not be evaluated in isolation.").

As the District Court correctly found, under that standard, Plaintiff has pled sufficient facts to support his claims that the supervisors were deliberately or recklessly involved in the fabrication, including:

- One month before the raid, Bharara described insider trading as "a top criminal priority" for his office. Insider-trading investigations like this one were high-profile and used expensive investigative methods such as wiretaps, creating incentives to produce commensurately significant prosecutions. JA-28 (¶50), JA-29 (¶54), JA-31 (¶62).

- Based on the customs and practices of the FBI and USAO, Bharara and other supervisors up the chain were kept apprised of developments in significant insider-trading investigations like this one. Sources quoted in the press said Bharara himself was "overseeing

40

some of the highest-priority investigations." JA-28 (¶49), JA-29 (¶54), JA-30 (¶¶56–60).

- David Ganek was the highest profile target at Level Global. The experienced AUSAs and FBI agents present at Adondakis's November 2, 2010, interview would have fully discussed and vetted that Adondakis could not implicate Ganek, and, upon information and belief, would have shared that information with their supervisors. JA-30 (¶55), JA-33 (¶72), JA-34 (¶77), JA-46 (¶132).

- On Friday, November 19, 2010, the *Journal* broke a story that the USAO and FBI, capping a three-year investigation, were preparing insider trading charges against financial professionals. In addition to the publication of this article, representatives of the USAO and FBI were directly contacted for comment. JA-34 (¶¶80–81).

- In reality, Defendants were not close to making arrests or bringing charges against anyone at Level Global, and would not do so for 14 months. After the publication of the *Journal* article, the Supervisory Defendants made the decision to conduct a high-profile raid of targets including Ganek, despite the lack of any true evidence implicating him. JA-19 (¶10), JA-38 (¶93).

- Such raids of legitimate businesses are extraordinarily rare; upon information and belief the November 22, 2010 raids are the only instances of the FBI and USAO conducting a physical raid of a hedge fund's office when there were no simultaneous arrests made or charges filed. Consistent with the practices of the FBI and USAO, a supervisor would have approved the raid and the decision to target Ganek despite the lack of evidence against him. JA-35 (¶83), JA-37–38 (¶¶92–94).

- The apparent purpose of raiding Level Global—as opposed to serving a subpoena—was to publicize the investigation. JA-39 (¶¶100–02).

- The November 22, 2010 raids were immediately covered by the *Journal*, and subsequently other papers. Upon information and belief, one or more Defendants tipped the *Journal* about the raid as part of an office-wide public relations strategy. Subsequent news articles cited

unnamed sources complaining that Bharara's office "is hyping his role in the insider-trading probe with a massive public relations campaign that includes selective leaks about upcoming arrests." JA-38 (¶¶95–96), JA-40 (¶103).[9]

- According to FBI and DOJ policies, approval for communications with the press would have had to have come from supervisors. The tip to the *Journal* violated DOJ policies and procedures on when it is appropriate to communicate with the press. JA-39 (¶¶97–99).

- Subsequent statements by supervisors confirmed their direct involvement in the investigation and raid. At a meeting with Level Global representatives in December 2010, Supervisor Zabel assured them that the raid had been carefully considered at the highest levels and that all necessary precautions had been taken. JA-18 (¶6), JA-41 (¶110).

- Bharara, too, was directly involved. In February 2011 a highly respected former federal prosecutor from Bharara's office asked him to clarify that Ganek was not the focal point of the investigation and that the USAO did not allege that there was probable cause to charge Ganek with insider trading—in other words, to make sure that his office was not unnecessarily causing an entire company to shut down based on the actions of one former employee. Bharara told his former colleague he would follow up, and within days responded that he had consulted with his team and that they stood by their actions. Based on these representations, either Bharara knew the allegations about Ganek were fabrications, or he was recklessly indifferent to the fact they were fabrications. JA-18–19 (¶¶7–8), JA-43–44 (¶¶119–24).

_____

[9] Defendants state, with no authority, that the allegations regarding the media tip "need not be credited." Defs.' Br. at 41 n.8. Leaving aside the fact that this is a well-pled allegation, which must be taken as true, the allegation that one of the Supervisor Defendants tipped off the media is further supported by allegations that the Supervisor Defendants' choice to conduct a raid was itself for publicity purposes, JA-39 (¶¶100–02), JA-55 (¶170), the office-wide public relations strategy regarding insider trading cases, JA-40 (¶¶103–04), and that "the *Journal* posted immediate and prominent coverage of the raid," JA-38 (¶¶95–96).

- Supervisors Rodriguez, Rojas, Chaves, Garcia and Berger were all subsequently publicly recognized by Bharara and his counterpart at the FBI for their contributions to the investigation of Level Global. JA-30 (¶61).

Defendants claim that it "defies logic and common sense" that a Defendant who fabricated evidence "would reveal the fabrication to his or her supervisors." Defs.' Br. at 40. But as the District Court concluded, "it seems entirely plausible that those defendants would have run such a decision 'up the ladder' in shaping the Affidavit." JA-186 n.19. Indeed, it is at least as plausible that the very instruction to include Ganek as a target of the raid—despite the lack of evidence implicating him—came from the top. After all, the priority put on the investigation came from the top, and the benefit of a successful raid of a high-profile target inures most to those at the top of the chain.

But Ganek need not establish that much to have a supervisory liability claim. Supervisors are also culpably "personally involved" in a constitutional violation if they "after being informed of the violation through a report or appeal, failed to remedy the wrong" (*Colon* factor (2)); were "grossly negligent in supervising subordinates who committed the wrongful acts" (*Colon* factor (4)); or "exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring" (*Colon* factor (5)). *Warren*, 823 F.3d at 136 (internal quotation marks omitted) (quoting *Colon*, 58 F.3d at 873)).

43

That is precisely what was alleged here, in great detail. High-level supervisors including Zabel and Bharara were directly approached several times with credible evidence that there was no basis for a search of Ganek, and that making Ganek the target of the search (or failing to clarify that he was not considered a target) would cause the destruction of Level Global. These supervisors indicated that they *had* discussed the raid and the basis for it in detail with their teams—both before and after the raid. And yet the supervisors failed to remedy the situation when it could have made a difference. As the District Court noted, "Ganek plausibly pleads that the Supervisor Defendants could have prevented a significant amount of the harm caused by the alleged Fourth Amendment violation if they had learned—prior to Level Global's closure—that the search of Ganek's office had been predicated on false evidence." JA-181–82.

However, by the time of the *Newman* trial the Government was crystal clear that Adondakis had not implicated Ganek, eliciting this testimony during Adondakis's direct examination. Either the Supervisor Defendants knew that Adondakis could not implicate Ganek at the time of the raid, but approved a search targeting Ganek anyway on the hopes they would eventually be able to make a case against him (one plausible explanation); they learned in between the raid and the closing of Level Global that there was no basis to target Ganek, yet failed to own up to the error in time to save the business (a second plausible explanation);

44

or, in deliberate indifference to Ganek's rights, they failed to learn the true facts until after Level Global had closed, even though they were readily able to uncover them when they prepared to prosecute Chiasson (a third plausible explanation). Crucially, *all* of these are ways the Supervisor Defendants would be culpable. And given these plausible theories of liability, the supervisory claims may not be dismissed at this stage.

Although Defendants accuse the District Court of "misconstru[ing]" the pleading standard, Defs.' Br. at 40, it is they who misconstrue the plausibility standard for a probability standard; they endeavor to convince the Court that their innocent explanation is more likely true. "But a court at this stage of our proceeding is not engaged in an effort to determine the true facts. The issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim." *Columbia Univ.*, 831 F.3d at 48. As the District Court determined, based on the wealth of specific facts alleged, Plaintiff's Complaint meets that burden.

To the extent Defendants' argument is that it is not plausible that supervisors at the USAO or the FBI would ever engage in misconduct, it is, sadly, incorrect. *See, e.g.*, *Zahrey*, 221 F.3d at 344 (permitting *Bivens* action against AUSA for fabricating evidence to proceed); *Morse*, 804 F.3d at 540–41 (affirming jury verdict against state assistant attorney general and investigator for fabricating

45

evidence); *see also* U.S. Dep't of Justice, Office of Prof'l Responsibility, *Annual Report* 9–10 (2014) (noting that 55% of investigations of DOJ attorneys closed by OPR in 2013, and 40% in 2014, resulted in findings of intentional or reckless misconduct), *available at*: http://www.justice.gov/opr/file/798006/download; *Nielsen v. Rabin*, 746 F.3d 58, 64 (2d Cir. 2014) ("We would love to live in a world where it is implausible for a doctor to disregard her oath and refuse to treat a patient she believed had attacked a female officer—just as we would love to live in a world where it is implausible for an employer to be so irrational as to refuse to hire a qualified applicant because of the applicant's skin color. Unfortunately, we do not.").

Defendants also complain the Complaint lacks allegations such as "the specific meetings, conversations or other communications" that occurred between the individual Defendants who were present at the meeting and their supervisors. Defs.' Br. at 37. But Defendants themselves represented they had such internal meetings: Zabel told a Level Global attorney that "the raid had been carefully considered at the highest levels," JA-18 (¶6), JA-41 (¶110), and Bharara told another "that he had consulted with his team," JA-18–19 (¶¶7–8), JA-43–44 (¶¶119–24). In any event "a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler*, 751 F.3d at 70. And the level of detail

46

Defendants request—internal communications within the FBI and USAO—would be impossible to obtain pre-discovery. The law does not put Plaintiff to that impossible burden. *See Arista*, 604 F.3d at 120. Rather, "the plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case." *Garcia-Catalan v. United States*, 734 F.3d 100, 104–05 (1st Cir. 2013).

The same is true with respect to the specifics about which of the named supervisors were most involved. Although the Complaint includes specific allegations about specific supervisors where possible, for the most part which supervisor approved which investigative step is information particularly within Defendants' control. As a result, this neither can—nor is required to—be described in good faith before discovery. *See Arista*, 604 F.3d at 120. To deal with this issue, the District Court planned limited discovery proportional to the needs of identifying the role each supervisor played. And, although given what is currently known it is *plausible* that each Supervisor Defendant is liable, Plaintiff, especially sensitive to the dangers of false accusations, has already promised to voluntarily dismiss any supervisors who discovery reveals were not directly involved in the misconduct.

In short, adequate safeguards exist to protect the Supervisor Defendants' rights, should this case proceed to discovery. But the flipside is not true. This is an

extraordinary case, presenting both exceptional proof, pre-discovery, of fabrication of evidence, and exceptional evidence, pre-discovery, of the direct involvement of the supervisors. If Defendants' argument were to prevail here, it is difficult to imagine a claim for supervisory liability that could pass muster; this Court would in effect be enacting absolute immunity for supervisors. Such a rule is manifestly inconsistent with a basic principle of our government: no person, not matter how lofty his or her position, is above the law. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 149–50 (1803) (holding a "high officer…is not above law").

### A. This case is consistent with, but does not rely upon, the outcome in *Turkmen v. Hasty*.

The District Court's holding is consistent with *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), *cert. granted*, 2016 WL 2653797 (Oct. 11, 2016), but the District Court did not rely on *Turkmen* alone. Ganek's case is far easier. The *Turkmen* plaintiffs—a putative class of hundreds of post-9/11 detainees—sued the nation's highest ranking law enforcement officials, including the Attorney General, FBI Director, and INS Commissioner. Even though the plaintiffs, who did not have legal immigration status, conceded that they were lawfully detained, this Court concluded that they had adequately pleaded *Bivens* claims against the supervisory defendants. The intent standard for their claims was remarkably high—they had to show the defendants' punitive intent for the conditions of confinement claims and discriminatory purpose for the discrimination claims. *See Turkmen*, 789 F.3d at

237–38, 252. The district court had ruled that the plaintiffs failed to show that the supervisory defendants were aware of those conditions. *See Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 340 (E.D.N.Y. 2013). But this Court reversed, concluding that the following allegations led to an inference that the supervisory defendants knew about the harsh and discriminatory conditions of confinement: the FBI Director ran the 9/11 investigation out of FBI Headquarters; the supervisory defendants received daily reports of arrests and detentions; one allegation of mistreatment was brought to the Attorney General's attention; members of the Attorney General's staff contacted prison officials to ensure that detainees could not communicate with the outside or with other inmates; and there were media reports of detainee mistreatment. *Turkmen*, 789 F.3d at 239–40.[10]

The District Court found "obvious parallels" between this case and *Turkmen*, but this case is much stronger. JA-185. Unlike the *Turkmen* plaintiffs, Ganek does not have to plead that the defendants acted with punitive intent or discriminatory purpose—only that they knew that the government had no basis for searching him. Unlike the *Turkmen* complaint, which did not allege that the supervisory

---

[10] Defendants misread *Turkmen* as requiring a plaintiff to present evidence like the DOJ Office of the Inspector General reports that were available there. Defs.' Br. at 47–48. But although this Court acknowledged that those reports provided "invaluable context" and "help[ed] orient [the Court's] analysis," *Turkmen*, 789 F.3d at 226, it by no means suggested that the plausibility of a *Bivens* claims turns on the availability of such reports. Nor could it, without predicating *Bivens* liability for supervisors on the government's publication of its own internal review.

49

defendants knew about any *particular* conditions affecting any *particular* plaintiff, Ganek specifically alleges the direct involvement of supervisors up to and including Bharara in reviewing the individualized basis for searching him. And there is no question about whether Ganek pleaded a *Bivens* claim. As the District Court recognized, "[u]nlike the plaintiffs in *Turkmen*, Ganek does not seek to extend the reach of *Bivens* liability into a new arena." JA-184 n.17.

## III.    A reasonable supervisor would have known he could not ignore a subordinate's fabrication of evidence.

Defendants' final assertion is that the failure-to-intercede claims against the Supervisors should be dismissed on qualified immunity grounds. Defendants claim that if the Supervisor Defendants learned after the raid that officers they supervised had violated Ganek's constitutional rights—by conducting a search of him based solely on fabricated evidence—the Supervisors had no obligation to take any step to mitigate the harm their subordinates continued to cause. This, too, is incorrect.

First, Defendants do not contest that, if the Supervisor Defendants knew about the lie *before* the execution of warrant, they would have a clearly established duty to intervene. *See, e.g.*, *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) ("Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality.") (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)). Because Plaintiff has plausibly alleged that the Supervisors *were* aware before the raid—as the District Court put it, that the individual

50

Defendants "would have run such a decision 'up the ladder' in shaping the Affidavit," JA-186 n.19—the Court need not even reach this issue at this stage. *See, e.g.*, *Columbia Univ.*, 831 F.3d at 59 ("The role of the court at this stage…[is] merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed.").[11]

But even with respect to the scenario Defendants posit—Supervisors who learned of the lie in the warrant *after* the raid but *before* Level Global closed—Defendants' argument misses the mark. Clear law in a number of overlapping contexts put the Supervisor Defendants on notice they were not free to sit on their hands in that situation. Plaintiff need prove nothing more at this stage. *See Zahrey*, 221 F.3d at 357 ("[F]or a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful."); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding where "a reasonable official would understand that what he is doing violates [a constitutional] right," qualified immunity will not serve as a shield).

---

[11] The District Court also considered Plaintiff's failure-to-intercede claim with respect to the non-supervisory Defendants, correctly recognizing it as an alternative theory of liability: "if certain defendants took a more active role in shaping the Affidavit, they might be found directly liable for violating Ganek's constitutional rights, while other defendants may have simply had a realistic opportunity to intervene before the Affidavit was submitted to the magistrate." JA-179 (citing *Ricciuti*, 124 F.3d at 128–29 (holding that failure to intercede liability could arise from officers "cooperating" with a false arrest based on an allegedly fabricated confession despite "kn[owing] there was no probable cause to justify the arrest")). Defendants do not challenge this aspect of the District Court's decision.

First, it is significant that this argument is made only on behalf of the Supervisor Defendants. Two of the manners of proving supervisory liability recognized in this Court's seminal 1995 decision *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), are directly applicable: "(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," and "(5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." *Warren*, 823 F.3d at 136 (quoting *Colon*, 58 F.3d at 873). This alone clearly established the Supervisors' obligation to intervene "to remedy the wrong," even after the fact.

But there is more. As the District Court noted, "[u]nquestionably, there are circumstances where government agents would be ethically and constitutionally obligated to correct misrepresentations made in a warrant application." JA-180. As this Court explained decades ago: "when a definite and material change *has* occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists. Therefore, the magistrate must be made aware of any material new or correcting information." *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984); *cf. DuBose v. Lefevre*, 619 F.2d 973, 978 (2d Cir. 1980) ("Knowing use by the State of perjured testimony deprives the defendant of

52

due process…whether the prosecutor makes the false statements himself or allows the false statements of a witness to go uncorrected."). One would hope (indeed, expect) that this correction process would occur *prior* to the search. But even when the search has already occurred, material misrepresentations and omissions can make a search unreasonable, the normal remedy for which "is suppression *and return of those items [seized].*" *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (emphasis added).

In addition, the law has long been clear that even if officers reasonably believe a search is lawful when it is initiated, once they learn that is not the case, they have an obligation to immediately halt the search. *See, e.g.*, *Garrison*, 480 U.S. at 87 ("[The officers] were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."); *Simmons v. City of Paris*, 378 F.3d 476, 479–80 (5th Cir. 2004) (noting "clearly established constitutional rule" officers must "immediately terminate" search of the wrong residence); *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) ("[T]he officers were obligated to retreat as soon as they knew or reasonably should have known that there was a mistake."); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 289 (S.D.N.Y. 2015) ("[A]t the point that Scott allegedly knew they were in the wrong

apartment, the search was no longer constitutional, and the Officers' actions were no longer shielded by immunity."); *Closure v. Onondaga County*, No. 06-CV-926, 2007 WL 446595, at *7 (N.D.N.Y. Feb. 7, 2007) ("[I]t is clear that the qualified immunity defense cannot be sustained as a matter of law in the presence of evidence that police officers continued to search a residence after realizing they were in the wrong home.").[12]

Importantly, the District Court noted, "[t]he duty to intercede has been expressed broadly by the Second Circuit: 'An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know…that any constitutional violation has been committed by a law enforcement official.'" JA-181 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

As the Complaint makes clear, high-ranking Supervisor Defendants were explicitly told that Ganek's injuries, resulting directly from the fabrication in the warrant, continued beyond the day of the search itself. *See* JA-42–45 (¶¶113–28)

---

[12] Courts also routinely find officers who made misrepresentations were not acting in good faith. *See, e.g.*, *Bershchansky*, 788 F.3d at 112–14 (ordering exclusion of evidence obtained from Apartment 1 when warrant authorized search of Apartment 2; holding "the government's assertion that the agents acted in good faith is undercut by [the officer's] repeated erroneous and conflicting statements"); *United States v. Voustianiouk*, 685 F.3d 206, 215–16 (2d Cir. 2012) (ordering exclusion of evidence because agents "did not mistakenly find themselves in a part of the building that the warrant did not authorize them to search" and "the government deliberately withheld information from the magistrate judge who granted the warrant" in an attempt to obtain authorization for a broad search).

(detailing subsequent meetings and conversations with Defendants Zabel and Bharara). Nevertheless, Defendants did nothing. It is not only that they failed to inform Ganek's attorneys that they did not have evidence implicating him despite being specifically asked—twice. They did not inform the magistrate of the error. They did not take any steps to ensure the return of wrongfully seized property, such as Ganek's cell phone. They did not instruct their agents to halt the searches being conducted on Ganek's seized emails and documents. These failures are all the more grave given that the correction demonstrated that Ganek was not a member of an insider trading conspiracy, for as this Court has explained, "[i]n the due process context, the Supreme Court has shown special concern for the risk of erroneous deprivation posed to *innocent* owners." *Krimstock v. Kelly*, 306 F.3d 40, 56 (2d Cir. 2002) (emphasis added) (citing *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993)).[13]

Ganek does not claim that Defendants were obligated to hold some sort of press conference exonerating Level Global. Ganek simply contends, as the District Court found, that if the Supervisor Defendants discovered the material misrepresentation in the warrant affidavit, they were under a constitutional

---

[13] As the District Court properly recognized, Defendants' obligation to take *some* action is also eminently reasonable in light of the fact that it was the USAO that created the harm at issue. *See* JA-182 (noting that "courts have recognized a constitutional obligation to protect an individual when a 'governmental entity itself has created or increased the danger to the individual'" (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993))).

obligation to do *something* in order to mitigate or avoid "preventable harm" to Ganek. *Anderson*, 17 F.3d at 557. And Ganek has pled that if they had done so, the majority of the harm he suffered—the closure of his business—would have been averted. JA-42–45 (¶¶113–28).[14] Defendants are free to argue later, to a jury, that either there was no realistic opportunity to intervene or that doing so would have made no difference; they may not do so at this stage. *See Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) ("Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." (quotation marks omitted)).

Despite the plausible allegations of the knowledge and involvement of all the Supervisor Defendants in the misconduct, of course it is possible that some will be revealed through discovery to be less involved than it currently appears. *See Columbia Univ.*, 831 F.3d at 48. Should that occur, perhaps the Court will be in a position to reevaluate the question of qualified immunity on summary judgment. *See, e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (noting

---

[14] The law supports this position as well. *See, e.g.*, *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (affirming district court's determination that plaintiff "continue[s] to suffer a present, on-going injury due to the government's continued retention of derivative material from the FISA seizure"); *Morse*, 804 F.3d at 542 (affirming damages award against prosecutor and investigator for fabricating evidence resulting in indictment, including damages from Plaintiffs' subsequent below-market sale of business).

"unresolved factual issues" may "prevent an early disposition of the defense")
(internal citations and quotations omitted). At this stage, however, taking the
allegations in the Complaint as true, the Supervisor Defendants have not
established their right to dismissal as a matter of law.[15]

## CONCLUSION

The District Court correctly concluded that Plaintiff's "grave allegations"
are well supported and deserve to be explored in discovery. Defendants' appeal
should be denied, and the District Court's decision affirmed.


Dated: November 18, 2016          Respectfully submitted,
New York, NY

                                   /s/Anna Benvenutti Hoffmann

                                  Nancy Gertner
                                  Barry Scheck
                                  Nick Brustin
                                  Farhang Heydari
                                  Alexandra Lampert
                                  Rick Sawyer

                                  NEUFELD SCHECK & BRUSTIN, LLP
                                  99 Hudson St., 8th Floor
                                  New York, NY 10013
                                  **Attorneys for Plaintiff-Appellee**
                                  **David Ganek**

---

[15] That, of course, is all the District Court meant when it wrote it would be
"premature" to grant qualified immunity now. *See* JA-182.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 13, 946 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: November 18, 2016
New York, New York

Respectfully submitted,

/s/ Anna Benvenutti Hoffmann

NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

Counsel to Plaintiff-Appellee