# 16-1463-cv

# United States Court of Appeals

### *for the*

# Second Circuit

————◆————

DAVID GANEK,

*Plaintiff-Appellee,*

— v. —

DAVID LEIBOWITZ, REED BRODSKY, DAVID MAKOL, MATT KOMAR, JAMES HINKLE, HOLLY J. TRASK, DAVID CHAVES, PATRICK CARROLL, RACHEL ROJAS, DIEGO RODRIGUEZ, MARC P. BERGER, CHRISTOPHER L. GARCIA, RICHARD B. ZABEL, BOYD M. JOHNSON, III, PREETINDER S. BHARARA,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICUS CURIAE* THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF PLAINTIFF-APPELLEE

Joshua L. Dratel
LAW OFFICES OF
  JOSHUA L. DRATEL, P.C.
29 Broadway, Ste. 412
New York, New York 10006
(212) 732-0707

John W. Keker
Brook Dooley
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, California 94111
(415) 391-5400

*Attorneys for Amicus Curiae*

# **TABLE OF CONTENTS**

Page

STATEMENT OF INTEREST ......................................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 2

ARGUMENT ................................................................................................. 4

I.  Misconduct by prosecutors and law enforcement officers is far too
    common. ............................................................................................... 4

II. Prosecutors and law enforcement officers face few consequences for
    their misconduct. ............................................................................... 10

III. Civil rights lawsuits—and the threat of personal liability—play a
    critical role in deterring misconduct by prosecutors and law
    enforcement officers. ......................................................................... 16

CONCLUSION ............................................................................................ 20

CERTIFICATE OF COMPLIANCE ........................................................... 21

CERTIFICATE OF SERVICE ..................................................................... 22

1127060

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Federal Cases</u>

*Arizona v. Evans*
  514 U.S. 1 (1995)................................................................. 16

*Bivens v. Six Unknown Named Agents*
  403 U.S. 388 (1971)................................................. 3, 18, 19, 20

*Cain v. Darby Borough*
  7 F.3d 377 (3d Cir. 1993) ...................................................... 17

*Carey v. Piphus*
  435 U.S. 247 (1978)............................................................. 17

*Herring v. United States*
  555 U.S. 135 (2009)............................................................. 16

*Illinois v. Krull*
  480 U.S. 340 (1987)............................................................. 16

*Imbler v. Pachtman*
  424 U.S. 409 (1976)......................................................... 14, 19

*In re All Matters Submitted to the Foreign Intelligence Surveillance Ct.*
  218 F. Supp. 2d 611 (FISA Ct. 2002)........................................... 8

*In re Sealed Case*
  310 F.3d 717 (FISA Ct. Rev. 2002) ............................................. 8

*Robertson v. Wegmann*
  436 U.S. 584 (1978)............................................................. 17

*United States v. Leon*
  468 U.S. 897 (1984)............................................................. 16

*United States v. Martin*
  426 F.3d 68 (2d. Cir. 2005) .................................................... 8

ii

*United States v. Olsen*
737 F.3d 625 (9th Cir. 2013) ........................................................ 2, 4, 9, 14

*Van de Kamp v. Goldstein*
555 U.S. 335 (2009) ................................................................. 18

*Wyatt v. Cole*
504 U.S. 158 (1992) ................................................................. 17

**Federal Statutes**

42 U.S.C. § 1983 ......................................................... 3, 17, 19, 20

**Federal Rules**

Federal Rule of Appellate Procedure 29(a) ................................................. 2

**Other Authorities**

Center for Prosecutor Integrity, *An Epidemic of Prosecutor Misconduct*
(2013) ......................................................................... 5

Center for Public Integrity, *Harmful Error: Investigating America's
Local Prosecutors* (2003) ......................................................... 6

Christopher Slobogin, *Testilying: Police Perjury and What to Do About
It*, 67 U. Colo. L. Rev. 1037 (1996) ................................................. 7

City of New York Commission to Combat Police Corruption, *The New
York City Police Department's Disciplinary System: How the
Department Disciplines its Members Who Make False Statements*
(1996) ....................................................................... 7, 14

Commission to Investigate Allegations of Police Corruption and the
Anti-Corruption Procedures of the Police Department, *Commission
Report* (1994) ................................................................. *passim*

Final Report of the New York State Bar Association's Task Force on
Wrongful Convictions (2009) ....................................................... 12

iii

Francis A. Cavanagh, *Probable Cause in a World of Pure Imagination: Why the Candyman Warrants Should Not Have Been Golden Tickets to Search*, 80 St. John's L. Rev. 1091 (2006) ............................................. 8

Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721 (2001) ...................................................................... 11

Hon. Alex Kozinski, *Preface: Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. (2015) ............................................................... 5

Joseph P. Lawless, *Prosecutorial Misconduct: Law Procedure Forms* (4th ed. 2008) ....................................................... 11, 15, 17, 18

Kathleen M. Ridolfi, Maurice Possley, and Northern California Innocence Project, *Preventable Error: A Report on Prosecutorial Misconduct in California 1997-2009* (2010) ........................... 5, 6, 9, 11,12

Ken Armstong & Maurice Possley, *The Verdict: Dishonor*, Chicago Tribune (January 11, 1999) .............................................. 12, 13

New York City Commission to Combat Police Corruption, *Seventeenth Annual Report* (2015) .............................................................. 14

Shelby A.D. Moore, *Who is Keeping the Gate? What Do We Do When Prosecutors Breach the Ethical Responsibilities They Have Sworn to Uphold?*, 47 S. Tex. L. Rev. 801 (2006) .................................... 11

Stephen W. Gard, *Bearing False Witness: Perjured Affidavits and the Fourth Amendment*, 41 Suffolk U. L. Rev. 445 (2008) ............................ 7

U.S. Comm'n on Civil Rights, *Revisiting Who is Guarding the Guardians?* (2000) ................................................................... 18

iv

## STATEMENT OF INTEREST

The National Association of Criminal Defense Lawyers (NACDL) is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct.  NACDL was founded in 1958.  It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates.  NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges.  NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers.  NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole. NACDL has a significant interest in strengthening the protections of the Fourth and Fifth Amendments to the United States Constitution and guaranteeing that victims of constitutional violations are not left without recourse, which are the central issues addressed in this brief.  NACDL urges this Court to fortify those rights.

1

## SUMMARY OF ARGUMENT[1]

In many respects, this case is extraordinary. It is highly unusual for an FBI agent under direct examination at trial to admit to the existence of a false statement in a search warrant affidavit. It is rare for a prominent subject of a white collar criminal investigation, having not been charged with a crime, to strike back at the prosecutors with a civil rights lawsuit. And it is not every day that the United States Attorney for the Southern District of New York is alleged to be so directly involved in the allegations underlying a civil rights lawsuit.

In another respect, however, this case raises an issue that is far too common. Misconduct by prosecutors and other law enforcement officers—including the problem of false statements in search warrant affidavits—is rampant. Judge Alex Kozinski of the United States Court of Appeals for the Ninth Circuit, citing nearly 30 state and federal court reported cases, recently concluded that misconduct has reached "epidemic proportions." *United States v. Olsen*, 737 F.3d 625, 631-32 (9th Cir. 2013) (Kozinski, J., dissenting). Such misconduct damages the rights of defendants and impairs

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), this brief is filed with the consent of all parties. No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than amici or their counsel, make a monetary contribution to the preparation or submission of this brief.

2

the integrity of the criminal justice system as a whole. It also has the potential to harm innocent bystanders—as is alleged by the Plaintiff-Appellee here.

The problem of misconduct by prosecutors and other law enforcement officers persists, in large part, because the existing means to discipline prosecutors fail to provide an adequate deterrent. Courts, practitioners, and scholars all agree that those responsible for investigating and prosecuting crime are rarely sanctioned or otherwise held accountable for their misconduct by state bar organizations or by their own offices. Further, many of the traditional mechanisms for enforcing constitutional rights—such as the exclusionary rule—often fail to provide a remedy and do not provide sanctions on individual wrongdoers in any event.

Against this backdrop of ineffective discipline, individual civil rights lawsuits brought pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), play a vital role. Such actions provide a remedy to individuals whose rights have been trampled by law enforcement officials or prosecutors. More importantly, though, from the perspective of society as a whole—and from the perspective of preserving our functioning criminal justice system—such lawsuits act as a deterrent against misconduct and impose tangible consequences on wrongdoers.

3

NACDL respectfully requests that the Court consider this context as it evaluates the arguments in this case. NACDL is not in a position to comment on the underlying merits of Plaintiff-Appellee's claim or Defendants-Appellants' defenses, but the allegations as detailed in the Complaint describe a serious case of misconduct and a clear violation of the Fourth and Fifth Amendments. If the Court reverses the District Court's order denying the Defendants-Appellants' Motion to Dismiss, not only will the Plaintiff-Appellee be left without a remedy, but it is unlikely that any serious investigation of the allegations will take place or that any discipline will be imposed on those found to have committed misconduct. Accordingly, NACDL requests that the Court avoid an expansive application of the doctrine of qualified immunity here and affirm the District Court's decision to allow Plaintiff-Appellee the opportunity to pursue his claims.

## ARGUMENT

### I. Misconduct by prosecutors and law enforcement officers is far too common.

The misconduct alleged by the Plaintiff-Appellee against the federal prosecutors and the FBI agents charged with investigating this matter is all too common. Judges, practitioners, and scholars have long acknowledged that misconduct by prosecutors and law enforcement officers is endemic across the criminal justice system. *See, e.g., Olsen*, 737 F.3d at 631-32

4

(Kozinski, J., dissenting) (observing that "*Brady* violations have reached epidemic proportions in recent years, and the federal and state reporters bear testament to this unsettling trend" and citing 29 state and federal reported cases); Hon. Alex Kozinski, Preface: Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. Crim. Proc. viii-ix (2015); Center for Prosecutor Integrity, *An Epidemic of Prosecutor Misconduct* 4-5 (2013) (collecting sources), *available at* http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutorMisconduct.pdf.

A number of recent in-depth studies confirm that prosecutorial misconduct is a widespread problem. In 2010, the Northern California Innocence Project ("NCIP") undertook a study of more than 4,000 state and federal appellate rulings as well as media reports and trial court decisions in California between 1997 and 2009. *See* Kathleen M. Ridolfi, Maurice Possley, and Northern California Innocence Project, *Preventable Error: A Report on Prosecutorial Misconduct in California 1997-2009* 16 (2010) ("Preventable Error"). The NCIP's study revealed 707 cases in which courts explicitly found that prosecutors committed misconduct. *Id*. Further, in the 600 cases involving misconduct where the NCIP could identify the prosecutors involved, 67 prosecutors had committed misconduct in more than one case, three prosecutors had committed misconduct in four cases,

5

and two had done so in five cases. *Id.* at 3. The NCIP concluded that, "[w]hile the majority of California prosecutors do their jobs with integrity, the findings of [the NCIP study] demonstrate that the scope and persistence of the problem is alarming." *Id.* at 5.

In 2003, the non-partisan Center for Public Integrity conducted a nation-wide three-year study of state court appellate opinions, trial court decisions, and state bar disciplinary filings going back to 1970. *See* Center for Public Integrity, *Harmful Error: Investigating America's Local Prosecutors* (2003), *available at* https://www.publicintegrity.org/ accountability/harmful-error. The study found over 2000 cases in which prosecutorial misconduct was a factor in dismissing charges at trial, reversing convictions or reducing sentences. *Id.* The study found more than 500 additional cases in which prosecutorial misconduct was serious enough to merit discussion and thousands of other cases in which the courts labeled prosecutorial conduct as inappropriate. *Id.* "In 28 cases, involving 32 separate defendants, misconduct by prosecutors led to the conviction of innocent individuals who were later exonerated." *Id.*

Like the problem of prosecutorial misconduct, false statements and material omissions in search warrant applications are an unfortunately common phenomenon. A 2008 article concluded that "empirical

6

investigations … document widespread perjury by law enforcement officers in warrant affidavits."  Stephen W. Gard, *Bearing False Witness: Perjured Affidavits and the Fourth Amendment*, 41 Suffolk U. L. Rev. 445, 448 (2008); *see also* Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 U. Colo. L. Rev. 1037, 1043 (1996) ("Although estimating its prevalence is difficult, police misrepresentation on the application form and in oral testimony to the warrant magistrate has been recounted by numerous observers.").

Years of investigations into the conduct of New York City police officers have documented the widespread problem of documentary perjury, including officers swearing falsely under oath in affidavits.  *See* Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, *Commission Report* 36 (1994) ("Mollen Report").  A 1996 investigation by the City of New York Commission to Combat Police Corruption found that, in just a four-month period, the Internal Affairs Bureau referred 60 cases involving allegations that officers made false statements.  The City of New York Commission to Combat Police Corruption, *The New York City Police Department's Disciplinary System:  How the Department Disciplines its Members Who Make False Statements* 9 (1996).  Indeed, the Mollen Report identified

7

police falsifications as "probably the most common form of police corruption facing the criminal justice system."  Mollen Report at 36.

The pervasive problem of false statements in warrant affidavits is not limited to local police departments; it extends to the FBI and other federal law enforcement officers.  For example, the United States Foreign Intelligence Surveillance Court reported that, in September 2000, the United States government confessed to errors in 75 FISA applications, including "erroneous statements in the FISA affidavits of FBI agents" and "omissions of material facts from FBI FISA affidavits."  *In re All Matters Submitted to the Foreign Intelligence Surveillance Ct.*, 218 F. Supp. 2d 611, 620 (FISA Ct. 2002), *abrogated by In re Sealed Case*, 310 F.3d 717 (FISA Ct. Rev. 2002).  Just six months later, in March 2001, the government came back to the court to report similar misstatements in another series of FISA applications.  *Id*. at 621.

Likewise, the FBI affidavit supporting the search warrants executed in the government's "Operation Candyman" investigation into the distribution of child pornography contained statements that the FBI agent admitted were false and misleading.  *See, e.g.*, *United States v. Martin*, 426 F.3d 68, 72 (2d. Cir. 2005); *see also* Francis A. Cavanagh, *Probable Cause in a World of*

8

*Pure Imagination: Why the Candyman Warrants Should Not Have Been Golden Tickets to Search*, 80 St. John's L. Rev. 1091, 1095-96 (2006).

The consequences of prosecutorial and law enforcement misconduct are profound regardless of the guilt or innocence of the particular accused.

> Prosecutorial misconduct fundamentally perverts the course of justice and costs taxpayers millions of dollars in protracted litigation. It undermines our trust in the reliability of the justice system and subverts the notion that we are a fair society. At its worst, the guilty go free and the innocent are convicted.

Preventable Error at 4. In the words of Judge Kozinski, public officials' disregard for their constitutional obligations and the rights of the accused "erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law." Olsen, 737 F.3d at 632 (Kozinski, J., dissenting). "When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *Id.*

Likewise, the consequences of false statements by law enforcement officers can be devastating. "It can mean that defendants are unlawfully arrested and convicted, that inadmissible evidence is admitted at trial, and ultimately the public trust in even the most honest officer is eroded." Mollen Report at 43. Indeed, the Mollen Report noted that "Many law enforcement officials … believe that police falsification has led to a rise in

9

acquittals because juries increasingly suspect and reject police testimony." Mollen Report at 39.

Misconduct by prosecutors and law enforcement officers can also have less obvious consequences, including collateral damage to innocent bystanders as alleged by the Plaintiff-Appellee. Indeed, the American Bar Association specifically recognizes the risk of such collateral consequences in its Standards on Criminal Justice. Standard 26-2.8 on Search Warrants dictates that while the Constitution permits the use of a search warrant upon a showing of probable cause, prosecutors must consider whether good judgment and sound discretion warrant the collateral consequences of seeking and executing a warrant. Neither the Plaintiff-Appellee, nor the Level Global fund of which he was the manager, was ever the subject of criminal charges. Yet, as set out in the Complaint, on the basis of false statements contained in the search warrant affidavit, the FBI conducted a high-profile raid of Level Global's offices, which ultimately led to the firm closing, the loss of millions of dollars, and many entirely innocent employees losing their jobs.

## II.     Prosecutors and law enforcement officers face few consequences for their misconduct.

The consensus that misconduct by prosecutors and law enforcement officers is widespread is matched by a consensus that existing methods to

10

deter and punish misconduct are ineffective. Prosecutors "rarely, if ever, are called to task personally or professionally for their misconduct, even though it often has devastating consequences …." Joseph P. Lawless, *Prosecutorial Misconduct: Law · Procedure · Forms* §13.01 (4th ed. 2008); Shelby A.D. Moore, *Who is Keeping the Gate? What Do We Do When Prosecutors Breach the Ethical Responsibilities They Have Sworn to Uphold?*, 47 S. Tex. L. Rev. 801, 807 (2006); Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721, 751-54 (2001). The tools traditionally available to impose sanctions on those who violate the Constitution in the course of investigating and prosecuting crime fail to provide the necessary deterrent to misconduct.

Professional discipline—whether by state bar organizations or by individual offices and departments—has failed to address the problem of misconduct by prosecutors and law enforcement officers. These failings have been detailed in any number of reports over the years. For example, the 2010 *Preventable Error* study by the Northern California Innocence Project discussed above that identified 707 cases of prosecutorial misconduct in California between 1997 and 2009 found that "[o]nly six of the prosecutors in the 707 cases where misconduct was found were disciplined by the California State Bar." Preventable Error at 16.

11

A 2009 study by the New York State Bar Association Task Force on Wrongful Convictions concluded that prosecutorial misconduct was a substantial cause of wrongful convictions but that prosecutors were only rarely subject to discipline by the state bar or their own offices. *See* Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, at 19, 29-31 (2009) ("Task Force Report"). The Task Force reviewed 53 cases where the convictions were subsequently overturned by "judicial/formal exoneration." *Id.* at 5. It concluded that 31 of these wrongful convictions were the result of "government practices, by police or prosecutors," including the use of false evidence; the failure to turn over *Brady* material; improper collection, transfer and storage of evidence; and the refusal to investigate alternative suspects. *Id*. at 19. Yet, the Task Force reported that its "[r]esearch has not revealed public disciplinary steps against prosecutors," and it concluded that "[t]here is little or no risk to the specific [prosecutor] involved resulting from a failure to follow the [*Brady*] rule." *Id*. at 29.

A landmark 1999 Chicago Tribune series found that since 1963, 381 defendants nationally had their homicide convictions thrown out because prosecutors concealed exculpatory evidence or knowingly presented false evidence. Ken Armstrong & Maurice Possley¸ *The Verdict: Dishonor*,

12

Chicago Tribune (January 11, 1999), *available at*

http://www.chicagotribune.com/news/watchdog/chi-020103trial1-story.html.

Yet, out of these 381 wrongful convictions, only "one [prosecutor] was

fired, but [he] appealed and was reinstated with back pay"; one prosecutor

"received an in-house suspension of 30 days"; and a "third prosecutor's law

license was suspended for 59 days, but because of other misconduct in the

case." *Id*. "Not one received any kind of public sanction from a state lawyer

disciplinary agency or was convicted of any crime." *Id*.

Likewise, many law enforcement departments turn a blind eye toward

false testimony by officers and agents, and discipline for supervisors is

almost unheard of. *See* Mollen Report at 41-42. In fact, the Mollen Report

could not find even "a single instance in which a supervisor or commander

has been sanctioned for permitting perjury or falsification on their watch."

Mollen Report at 41. This failure to discipline officers for false testimony

has persisted despite efforts to combat the problem. In 1996, at the urging of

the New York City Commission to Combat Police Corruption, the New

York City Police Department amended its Patrol Guide to require dismissal

for officers found to have intentionally made false statements absent

exceptional circumstances. Yet, in its 2015 Annual Report, the Commission

found that "the Department rarely brought charges under this provision."

13

New York City Commission to Combat Police Corruption, *Seventeenth Annual Report* 103 (2015). Instead, the Commission found, the Department charges misconduct involving alleged false statements under less strict provisions of the Patrol Guide that do not carry a presumption of termination. *Id*.; *see also* The City of New York Commission to Combat Police Corruption, *The New York City Police Department's Disciplinary System: How the Department Disciplines its Members Who Make False Statements* 11 (1996) (concluding that, when internal discipline is enforced in instances of false statements, it is inadequate to the task of deterring future misconduct.).

Criminal prosecutions are even less common than disciplinary actions. *See, e.g.* Olsen, 737 F.3d at 630 (Kozinski, J., dissenting) ("Criminal liability for [prosecutorial misconduct] is practically unheard of"); Armstong & Possley, *supra* (finding that none of the prosecutors involved in the 381 homicide cases that were reversed due to prosecutorial misconduct was convicted of a crime).[2] The Mollen Report concluded that prosecutors are particularly unlikely to pursue cases involving false statements and

---

[2] Indeed, it is notable that the Supreme Court, in extending prosecutorial immunity in *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976), suggested that prosecutors who commit misconduct could be punished criminally, but cited no instance in which any such criminal prosecution had ever actually occurred.

14

testimony by law enforcement officers.  They are difficult to prove, and jurors are likely to be sympathetic to officers who "bend the rules" in the interest of pursuing alleged criminals.  *See* Mollen Report 42.

Finally, the exclusionary rule, which was intended to provide a disincentive to prosecutors and law enforcement officers alike against illegally gathering evidence, has historically been one of the primary means for addressing violations of the Fourth Amendment.  Yet, the exclusionary rule is an imperfect tool at best for deterring constitutional violations.  The rule many not even be invoked by innocent bystanders—like the Plaintiff-Appellee—who have been impacted by constitutional violations but are not in a position to move for the exclusion of illegally obtained evidence.[3]  Likewise, the rule plays only a very limited role in the great majority of criminal cases that are resolved by guilty pleas.  The exclusionary rule also provides no sanction—much less any tangible penalty—against culpable prosecutors or other law enforcement officers and thus its deterrent value is

---

[3] The same is true of other sanctions—like contempt or disqualification—that are available to defendants but not to third-party victims of constitutional violations.  Moreover, such sanctions are rarely ordered.  *See* Lawless, *supra* §§ 13.33 & 13.38.

15

minimal. And, of course, the exclusionary rule does not provide compensation to the victims of constitutional violations.[4]

## III. Civil rights lawsuits—and the threat of personal liability—play a critical role in deterring misconduct by prosecutors and law enforcement officers.

As documented above, there are few effective means for investigating and sanctioning constitutional violations committed by prosecutors and law enforcement officers. Thus, the present case offers a unique opportunity to fully investigate (through the civil discovery process) serious allegations of misconduct. NACDL does not, of course, know what that investigation will uncover, but it does know that if this case is not permitted to proceed to discovery, there is little hope of any thorough investigation much less any effective punishment.

---

[4] Moreover, the expansion of the good faith exception to the exclusionary rule has riddled the exclusionary rule with holes and limited its effectiveness. The good faith exception to the exclusionary rule was originated by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 922 (1984), where the Court declined to exclude evidence obtained from illegal searches conducted in "objectively reasonable reliance" on ultimately invalidated warrants. This principle has since been extended to other grounds of legal authority—such as illegal searches conducted in reliance on later invalidated statutes, *Illinois v. Krull*, 480 U.S. 340 (1987), illegal searches conducted in reliance on erroneous information in a Court's arrest warrant database, *Arizona v. Evans*, 514 U.S. 1, 14 (1995), and illegal searches conducted in reliance on an error in the police's warrant database, *Herring v. United States*, 555 U.S. 135 (2009).

16

It is not only the Plaintiff-Appellee who will benefit if this case moves forward. As the Supreme Court has recognized, the availability of compensatory damages under § 1983 acts both "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Compensating the victim of a constitutional violation both helps to make the victim whole and, by putting potential wrongdoers on notice that they will pay for any damages they cause, "deter[s] the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 256-57 (1978); *Robertson v. Wegmann*, 436 U.S. 584, 590-91 (1978) ("The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law."); *see also Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) ("Litigants who bring meritorious section 1983 claims advance societal interests because the vindication of their constitutional rights helps provide an important check on public officials and presumably deters a range of official misconduct."); Lawless, *supra* §13-3 ("the ability to maintain actions against prosecutors … may well have a strong effect on the conduct of prosecutors and will help to lessen instances of prosecutorial misconduct"). Likewise, the United States Commission on

17

Civil Rights "has concluded in various reports that civil lawsuits against individual [law enforcement] officers may help deter police misconduct." U.S. Comm'n on Civil Rights, *Revisiting Who is Guarding the Guardians?* (2000), *available at* http://www.usccr.gov/pubs/guard/ch5.htm.

Meritorious civil rights cases not only serve to deter individual prosecutors and law enforcement officials, but they can also serve as a spur to systemic change in the form of better training and improved procedures. One commentator has observed that prosecutorial misconduct cases, which carry the prospect of enormous damages, "offer the hope of stimulating prosecutors' offices to improve their training and procedures for complying with constitutional obligations in order to minimize the risk of wrongful convictions occurring in the future." Lawless, *supra* §13.01. The present case—with its high stakes and its high-profile participants—offers an opportunity to cast light on conduct that too often goes unreported and unpunished.

NACDL recognizes that *Bivens* actions, as currently circumscribed by Supreme Court precedent, are not perfect vehicles for addressing misconduct—particularly by prosecutors. Prosecutors generally enjoy absolute immunity for conduct after the investigatory stage of a criminal case. *See, e.g.*, *Van de Kamp v. Goldstein*, 555 U.S. 335, 335 (2009)

18

("Prosecutors are absolutely immune from liability in § 1983 suits brought against prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process.'") (quoting *Imbler*, 424 U.S. at 430). Furthermore, under the prevailing law, it is hard to hold prosecutorial supervisors liable given the difficulty in establishing their direct involvement in the alleged constitutional violation. Thus, under the law as currently construed, Section 1983 and *Bivens* actions are never going to be the only bulwark against prosecutorial and police misconduct.

Yet, these civil rights suits, as one of the only currently available means to address prosecutorial and law enforcement abuses, remain critical. And given the limitations on Section 1983 and *Bivens* actions already imposed by existing precedent, NACDL respectfully suggests that the Court should avoid any unnecessarily narrow interpretation of existing precedent that would further limit individual plaintiffs from holding prosecutors and law enforcement officers accountable for their conduct. To do so in this case, where the Complaint alleges in detail clear constitutional violations, would be particularly damaging.

19

## CONCLUSION

NACDL respectfully requests that the Court, in reaching its decision in this case, consider the vital role played by Section 1983 and *Bivens* actions in deterring misconduct by prosecutors and law enforcement in the absence of other effective disciplinary means for ferretting out and sanctioning misconduct. NACDL further requests that, in light of the important role played by civil rights suits such as this one, the Court eschew any unnecessarily narrow interpretations of existing law and affirm the District Court's decision to allow the Plaintiff-Appellee's case to go forward.

San Francisco, California.

November 28, 2016

Joshua L. Dratel
LAW OFFICES OF
   JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, NY 10006
(212) 732-0707

KEKER & VAN NEST LLP

By:   */s/ Brook Dooley*

   John W. Keker
   Brook Dooley
   KEKER & VAN NEST LLP
   633 Battery Street
   San Francisco, CA 94111-1809
   (415) 391-5400

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,080 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

San Francisco, California.                     KEKER & VAN NEST LLP

November 28, 2016
                                        By:   */s/ Brook Dooley*
                                              John W. Keker
                                              Brook Dooley
                                              KEKER & VAN NEST LLP
                                              633 Battery Street
                                              San Francisco, CA 94111-1809
                                              (415) 391-5400

21

1127060

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the:

### BRIEF OF THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

with the clerk of the court for the United States Court of Appeals for the

Second Circuit by using the Appellate CM/ECF system on:

### November 28, 2016

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

San Francisco, California.                KEKER & VAN NEST LLP

November 28, 2016

                            By:    */s/ Brook Dooley*
                                   John W. Keker
                                   Brook Dooley
                                   KEKER & VAN NEST LLP
                                   633 Battery Street
                                   San Francisco, CA 94111-1809
                                   (415) 391-5400

22

1127060