# 16-1463

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 16-1463

DAVID GANEK,

*Plaintiff-Appellee,*

—v.—

DAVID LEIBOWITZ, REED BRODSKY, DAVID MAKOL, MATT KOMAR, JAMES HINKLE, HOLLY J. TRASK, DAVID CHAVES, PATRICK CARROLL, RACHEL ROJAS, DIEGO RODRIGUEZ, MARC P. BERGER, CHRISTOPHER L. GARCIA, RICHARD B. ZABEL, BOYD M. JOHNSON III, PREETINDER S. BHARARA,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

JOON H. KIM,
*Acting United States
Attorney for the Southern
District of New York,
Attorney for Defendants-
Appellants.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2769

ANDREW E. KRAUSE,
SARAH S. NORMAND,
JEFFREY S. OESTERICHER,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

POINT I—Ganek Fails to Allege that the
Warrant Affidavit Contained a
Material Misrepresentation or Omission . . . . . .  5

    A.  Ganek Has Not Alleged Any
Misstatement in the Affidavit . . . . . . . . . .  5

    B.  The Purported Misstatement Was Not
Material to a Finding of Probable Cause . .  9

    C.  Ganek Has No Independent
Fifth Amendment Claim . . . . . . . . . . . . . .  17

POINT II—Ganek Does Not Plausibly Allege That
Any Supervisors Knew of Any
Misrepresentation or Omission in the
Search Warrant Affidavit . . . . . . . . . . . . . . . . .  18

    A.  Ganek's Allegations of Supervisory
Knowledge Lack Any Factual Basis . . . . .  18

    B.  *Turkmen* Is of No Use to Ganek  . . . . . . . .  22

    C.  Ganek Cannot Establish Supervisory
Liability Based on Allegedly
Negligent Supervision . . . . . . . . . . . . . . . .  24

POINT III—Ganek Identifies No Clearly
Established Law Requiring a Public
Statement of Exoneration . . . . . . . . . . . . . . . . .  26

ii

PAGE

Conclusion ............................... 30

iii

# TABLE OF AUTHORITIES

*Cases*:

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . 6

*Anderson v. Branen*,
   17 F.3d 552 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009). . . . . . . . . . . . . . 20, 22, 24, 25

*Colon v. Coughlin*,
   58 F.3d 865 (2d Cir. 1995) . . . . . . . . . . . . . . . 24, 26

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 6

*Escalera v. Lunn*,
   361 F.3d 737 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 17

*Gerstein v. Pugh*,
   420 U.S. 103 (1975). . . . . . . . . . . . . . . . . . . . . . . 18

*Grullon v. City of New Haven*,
   720 F.3d 133 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 24

*Messerschmidt v. Millender*,
   132 S. Ct. 1235 (2012). . . . . . . . . . . . . . . . . . . . . 13

*Morse v. Fusto*,
   804 F.3d 538 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 18

*Mullenix v. Luna*,
   136 S. Ct. 305 (2015). . . . . . . . . . . . . . . . . . . . . . 26

iv

*Raspardo v. Carlone*,
   770 F.3d 97 (2d Cir. 2014) . . . . . . . . . . . . . . . 24, 25

*Ricciuti v. N.Y.C. Transit Auth.*,
   124 F.3d 123 (2d Cir. 1997) . . . . . . . . . . . . . . . . 18

*Salman v. United States*,
   137 S. Ct. 420 (2016). . . . . . . . . . . . . . . . . . . . . . 3, 10

*Turkmen v. Hasty*,
   789 F.3d 218 (2d Cir. 2015) . . . . . . .   22, 23, 24, 25

*U.S. Postal Serv. v. C.E.C. Servs.*,
   869 F.2d 184 (2d Cir. 1989) . . . . . . . . . . . . . . . . 14

*United States v. Cohan*,
   628 F. Supp. 2d 355 (E.D.N.Y. 2009). . . . . . . . . . 14

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013) . . . . . . . . . . . . . . . . 14

*United States v. Jacobson*,
   4 F. Supp. 3d 515 (E.D.N.Y. 2014). . . . . . . . . . . . 14

*United States v. Levin*,
   No. 15 Cr. 101 (KBF), 2015 WL 5602876
   (S.D.N.Y. Sept. 23, 2015) . . . . . . . . . . . . . . . . . . . 15

*United States v. Levy*, No. S5,
   No. S5 11 Cr. 62 (PAC), 2013 WL 664712
   (S.D.N.Y. Feb. 25, 2103), *aff'd*, 803 F.3d 120
   (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Lustyik*,
   57 F. Supp. 3d 213 (S.D.N.Y. 2014). . . . . . . . . . . 15

v

*United States v. Marin-Buitrago,*
    734 F.2d 889 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 27

*United States v. Martin,*
    426 F.3d 83 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 15

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 3

*United States v. Raymonda,*
    780 F.3d 105 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 11

*United States v. Vilar,*
    No. S3 05 Cr. 621 (KMK), 2007 WL 1075041
    (S.D.N.Y. Apr. 4, 2007) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Zemlyansky,*
    945 F. Supp. 2d 438 (S.D.N.Y. 2013) . . . . . . . . . 15

*Velardi v. Walsh,*
    40 F.3d 569 (2d Cir. 1994) . . . . . . . . . . .  16, 17, 25

*Walczyk v. Rio,*
    496 F.3d 139 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 12

*Warren v. Pataki,*
    823 F.3d 125 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 24

*Ybarra v. Illinois,*
    444 U.S. 85 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ying Jing Gan v. City of New York,*
    996 F.2d 522 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 27

vi

*Statutes*:

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Other authorities*:

Reply Br. of the United States in support of petition
　　for writ of *certiorari*, No. 15-137,
　　*United States v. Newman,* 2015 WL 5254347
　　(Sept. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 16-1463

---

DAVID GANEK,

*Plaintiff-Appellee,*

—v.—

DAVID LEIBOWITZ, REED BRODSKY, DAVID MAKOL,
MATT KOMAR, JAMES HINKLE, HOLLY J. TRASK, DAVID
CHAVES, PATRICK CARROLL, RACHEL ROJAS, DIEGO
RODRIGUEZ, MARC P. BERGER, CHRISTOPHER L.
GARCIA, RICHARD B. ZABEL, BOYD M. JOHNSON III,
PREETINDER S. BHARARA,

*Defendants-Appellants.*

---

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

---

### Preliminary Statement

On November 21, 2010, federal authorities executed search warrants at the offices of Level Global and two other hedge funds in connection with a wide-ranging investigation of potential insider trading involving third-party consultants who were hired by hedge funds to provide inside information relating to various public companies. The Level Global warrant authorized searches of the fund's servers, the computers of former Level Global employee and cooperating

2

witness Spyridon Adondakis, and the offices, records and devices of Level Global co-founders David Ganek and Anthony Chiasson and a fourth Level Global employee. The affidavit in support of the search warrant established probable cause to believe that Adondakis had obtained inside information about multiple public companies from multiple sources, and that he had provided that information to Ganek, Chiasson, and the fourth Level Global employee, who then traded on the information. Adondakis and Chiasson were later convicted of securities fraud and conspiracy based on their insider trading, as were employees of another hedge fund searched on the same day as Level Global.

None of these facts is contested—and yet they are largely absent from Ganek's brief. Ignoring nearly all of the undisputed facts in the 37-page search warrant affidavit, which is incorporated by reference in the complaint, Ganek focuses myopically on a single statement, which appears in two places, that Adondakis informed Ganek regarding the sources of the "Inside Information" he provided. But he disregards the plain language of that statement, insisting that the term "Inside Information," defined in the affidavit to mean inside information about *multiple public companies*, must instead mean only information about *Dell securities*. Because Ganek's interpretation conflicts with the plain terms of the affidavit—and his complaint does not allege that the defendants misrepresented anything about companies other than Dell—he fails to allege any misstatement or omission in the affidavit, and all of his claims fail on that basis alone.

3

Even if Ganek properly pled that the affidavit contained a misstatement, the defendants are nonetheless entitled to qualified immunity because there would have been ample probable cause to search Ganek's office, records, and devices (along with the other locations within Level Global) even if the affidavit were "corrected" to remove the statement he contests and to state that Adondakis did not tell Ganek the sources of Inside Information. Contrary to the premise of Ganek's argument, the search warrant was not directed at him personally, but rather at locations containing evidence of unlawful insider trading. Although ignored by Ganek, the undisputed facts in the affidavit provided probable cause to believe that three other Level Global employees were engaged in insider trading with respect to multiple public companies, and that Ganek was a participant (whether witting or unwitting) in the trading activity under investigation.

Ganek repeatedly and improperly invokes legal developments that occurred years after the events at issue, including by suggesting that this Court's decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), should color the assessment of the defendants' investigative conduct in 2010. But the Supreme Court's recent decision in *Salman v. United States*, 137 S. Ct. 420 (2016), which overruled the fundamental legal holding in *Newman*, illustrates the fallacy of this approach. For purposes of qualified immunity, the Court may only consider the clearly established law at the time of the challenged actions. Under the law that existed in 2010, the defendants had probable cause to believe that multiple Level Global employees had engaged in insider trading, and that it was appropriate

4

to search the locations identified in the search warrant for evidence of that crime.

The supervisor defendants are entitled to qualified immunity for the additional reason that Ganek has not plausibly alleged that they were personally involved in the alleged misconduct. Ganek's list of allegations that supposedly support his claims of supervisory liability is devoid of facts suggesting that any supervisor ever learned about any purported misstatement in the warrant affidavit. Ganek speculates that supervisors would have learned this information because they were "kept apprised of developments" and ultimately approved the decision to seek search warrants, but such allegations could be made against supervisors in almost any context, and amount to an impermissible *respondeat superior* theory of liability.

Finally, Ganek has not identified any clearly established law that would have put the defendants on notice that they had a constitutional obligation to publicly correct a sealed search warrant affidavit, after the search was completed, to clarify Ganek's level of knowledge of insider trading activity at Level Global. The cases cited by Ganek only underscore the absence of any such law, and the defendants accordingly are entitled to qualified immunity.

5

# ARGUMENT

## POINT I

### Ganek Fails to Allege that the Warrant Affidavit Contained a Material Misrepresentation or Omission

#### A. Ganek Has Not Alleged Any Misstatement in the Affidavit

Despite his vehemence, Ganek has not plausibly alleged any misstatement in the warrant affidavit. The complaint focuses on what Adondakis allegedly told investigators about Ganek's involvement with insider trading *in Dell securities*. (*See* JA 17, 18, 35-36). Yet each of the pertinent references to Ganek in the search warrant affidavit described his connection, through Adondakis, to "Inside Information," a term defined as relating to *multiple* public companies, not Dell specifically. (*See* JA 76, 97, 98).

This critical distinction cannot be casually dismissed as a "perceived mismatch" in wording. (Pl.'s Br. 24). The affidavit unambiguously and repeatedly used the defined term "Inside Information" to describe what Adondakis obtained from insiders at public companies, what he passed along to Ganek, Chiasson, and a fourth Level Global employee, and the trading that was conducted by Ganek, Chiasson, and the fourth employee.[1] (JA 97, 98). Ganek's Dell-focused allegations

---

[1]    Ganek cannot credibly maintain that the inclusive term "Inside Information" was used only to target

6

are simply inconsistent with the broadly defined term in the affidavit. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true").

Even in his brief, Ganek relies on Dell-specific allegations. Ganek admits that his concept of what constitutes the supposed "fabrication" in the affidavit is what Adondakis allegedly said about Ganek's knowledge of the source of information about Dell. (Pl.'s Br. 24-25). And he maintains (inexplicably) that excerpts of the trial testimony of Adondakis and Special Agent Makol are enough *by themselves* to substantiate his allegation that the affidavit contained a misstatement, even though the trial testimony *addressed Dell exclusively*. (JA 47-49; Pl.'s Br. 23, 24 n.1).[2] Merely restating these allegations does not change the

––––––––––

him. "Inside Information" appears 41 times in the warrant affidavit, and was part of the justification to search the offices, records and devices of *each* Level Global employee identified in the application.

[2]    Ganek vaguely alludes to "additional evidentiary support" not identified in the complaint (Pl.'s Br. 24 n.1), but it is axiomatic that on a motion to dismiss, "the only facts to be considered are those alleged in the complaint." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). And while non-conclusory factual allegations must be accepted as true at this stage, the defendants vigorously dispute Ganek's presentation and characterization of the facts as alleged.

7

fact that there was no statement in the affidavit that Adondakis told Ganek about the sources of information regarding Dell specifically, and there is no basis to infer that the term "Inside Information" referred to inside information regarding Dell, as opposed to other public companies.

Ganek advocates an expansive interpretation of certain allegations in the complaint to make them appear to reach beyond the focus on Dell information. (Pl.'s Br. 22-23, 24, 25-26). When considered in conjunction with Ganek's key substantive allegations, however, the only possible reading of the purportedly broader allegations is that they also concern Ganek's relationship to inside information about Dell. Ganek alleges that Adondakis admitted obtaining "sensitive, non-public information *regarding Dell*," "passed on information *about Dell*" to Ganek for Ganek to "use in making trading decisions," and never told Ganek "that information he had obtained *regarding Dell*" had come from an inside source. (JA 32 (¶¶ 69-71 (emphases added); *see also* JA 33 (¶ 76) (alleging "fabrication" of evidence inconsistent with Adondakis's statements *about Dell*)). Proximate sections of the complaint that refer to these core allegations using generic shorthand —including "Ganek's involvement," "the information," "inside information," and "insider trading" (*see, e.g.*, JA 33 (¶¶ 72-73), 34 (¶ 78), 36 (¶ 86))—can only properly be understood as referring to the Dell-specific information, and not as independent allegations regarding Ganek's knowledge of inside information generally.

8

Ganek attempts to remedy the gap between his allegations and the plain language of the affidavit by implying that other sections of the affidavit support the notion that "Inside Information" referred only to Dell. These arguments fare no better. That Dell was the only publicly-traded company used as a search term for searching Level Global's servers (Pl.'s Br. 25) does not alter the meaning of the defined term "Inside Information," nor does it suggest that investigators were focused exclusively on Dell at the time the search warrant was executed. Rather, the inclusion of search terms like "consultant," "Kinnucan" and "Broadband Research"—which would capture communications with third-party consultants about *any company*—is indicative of the broad objective, at this early stage of the investigation,[3] to locate evidence of insider trading involving any securities for which so-called expert consulting firms facilitated the transmission of Inside Information. (*See* JA 78-80, 115). Moreover, consistent with the fact that Adondakis was specifically linked in the affidavit to the receipt of Inside Information concerning multiple public companies from multiple sources (*see* JA 81, 83-84, 90-92), both the electronic

---

[3] Ganek intimates that the fact that the investigation was at a preliminary stage undermines the decision to use a search warrant. (Pl.'s Br. 31 n.4). But the affidavit explains that the timing of the warrant was motivated by a concern about potential destruction of evidence. (JA 103-06). In any event, the district court rejected Ganek's claim that the use of a search warrant rather than a subpoena violated his Fourth Amendment rights. (JA 168-69).

9

and paper search parameters for the offices, records, and devices of Ganek, Chiasson, Adondakis, and the fourth Level Global employee permitted investigators to search for evidence regarding Inside Information about "public companies," and were not restricted to Dell. (JA 116).

While Ganek undoubtedly would prefer that there was "no basis to assert Adondakis might have implicated Ganek with respect to [a company other than Dell]" (Pl.'s Br. 25), the plain language of the affidavit makes clear that there was. The crucial term "Inside Information"—used when describing all relevant interactions between Adondakis and Ganek, and all of Ganek's relevant subsequent conduct (JA 97, 98)—refers to multiple public companies, a definition that fits the overall context of the warrant application and the status of the investigation at that time. The district court erred in accepting Ganek's effort to equate the defined term "Inside Information" with inside information about Dell alone. Regardless of what Adondakis told investigators about Ganek's knowledge of the source of Dell information, Ganek's allegations about Dell are not sufficient to allege that the affidavit misrepresented his knowledge of the sources of "Inside Information."

## B.  The Purported Misstatement Was Not Material to a Finding of Probable Cause

The undisputed statements in the search warrant affidavit—all of which would remain part of any "corrected affidavit"—make clear that probable cause existed to authorize the same search of Ganek's office,

records, and devices that was permitted by the original Level Global warrant. Just like the district court, Ganek does not even address these statements, which assert that he was a direct participant (whether witting or not) in the illegal insider trading activity by Adondakis, Chiasson,[4] and the fourth Level Global employee.

According to the complaint, Adondakis admitted receiving "sensitive, non-public information regarding Dell" and passing it on to Ganek so that Ganek "could use [it] in making trading decisions." (JA 32 (¶¶ 69, 71), 90-93 (¶ 8(d)), 96-97 (¶ 11)). Ganek does not challenge the assertion in the search warrant affidavit that he and other Level Global employees "executed and caused others to execute securities transactions based in part on" Inside Information from public companies. (JA 36 (¶ 85 n.1 (quoting JA 97 (¶ 11)))). A hypothet-

---

[4]    Ganek suggests that no one at Level Global engaged in insider trading. (*See, e.g.*, Pl.'s Br. 15-16, 30). But prior to the announcement of a new (and now overruled) legal standard in *Newman*, Adondakis pled guilty to insider trading crimes, and Chiasson was convicted of insider trading crimes after a jury trial. Had the *Newman* court used the definition of "personal benefit" that the Supreme Court later confirmed was appropriate, *see Salman*, 137 S. Ct. at 428, the outcome of *Newman* may well have been different. *See* Reply Br. of the United States in support of petition for writ of *certiorari*, No. 15-137, *United States v. Newman,* 2015 WL 5254347, at *6-9 (Sept. 2015).

11

ical corrected affidavit therefore would establish probable cause to believe that Adondakis committed insider trading by causing others—*including Ganek*—to trade securities based on information that Adondakis knew came from an inside source. *See* 18 U.S.C. § 2(b); 15 U.S.C. § 78j(b). And there would be every reason to expect that evidence of the illegal trades—that is, evidence of Adondakis's criminal activity—would be found in Ganek's office, records, and devices, even if Ganek were an unwitting participant in the transactions. *See United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (probable cause exists if there is a "fair probability that . . . evidence of a crime will be found in a particular place" (citation and quotation mark omitted)).

The corrected affidavit would also describe crimes committed by Chiasson and the fourth Level Global employee. Ganek does not dispute those portions of the affidavit stating that: Chiasson and the fourth Level Global employee received improper Inside Information from Adondakis and third-party consultants; Adondakis informed Chiasson and the fourth Level Global employee of the sources of that information; and Chiasson and the fourth Level Global employee "executed and caused others to execute securities transactions based in part" on the Inside Information they received from Adondakis. (JA 93-94; 97-99). Given that Ganek cofounded Level Global with Chiasson, maintained a "large majority interest" in the business, and was "uniquely important" to the operations of the firm (JA 25), the only reasonable inference to draw from a corrected affidavit would be that Ganek was one of the people whom Chiasson and the fourth Level Global

12

employee "caused . . . to execute securities transactions" based on Inside Information. Consequently, Ganek's office, records, and devices would also be likely to contain evidence of insider trading crimes committed by Chiasson and the fourth Level Global employee regardless of Ganek's knowledge of the sources of the Inside Information.

Both Ganek and the district court wrongly portray Ganek's involvement in the trading activity under investigation as a "mere propinquity to others independently suspected of criminal activity." (Pl.'s Br. 31; JA 167 (quoting *Walczyk v. Rio*, 496 F.3d 139, 162-63 (2d Cir. 2007)). Ganek was no coincidental bystander, nor was he physically or temporally removed from the activities under investigation. *Contrast Ybarra v. Illinois*, 444 U.S. 85, 90-91 (1979) (invalidating search of tavern customer where police believed bartender was selling heroin); *Walczyk*, 496 F.3d at 161-63 (search of mother's home for son's firearms invalidated where son had not lived there in seven years). Rather, a corrected affidavit would state with particularity that Ganek was directly involved in making trading decisions on the basis of Inside Information received from Adondakis, and was closely identified with the other Level Global employees named in the affidavit.[5]

--------

[5]    Nor is there any basis to conclude that a magistrate judge would consider the information in a corrected affidavit to be "stale" based on an affidavit that acknowledged that Adondakis had not worked at Level Global since March 2010. (Pl.'s Br. 34 n.6). Indeed, the magistrate judge who reviewed the original warrant

13

Contrary to Ganek's assertion (Pl.'s Br. 29-35), a corrected affidavit would not have altered the scope of the search that would have been permitted as to Ganek.[6] Ganek was not like the other Level Global employees who were not directly implicated in the trading activities under investigation. It would be appropriate and necessary, even in a corrected affidavit, to treat Ganek differently from "all other Level Global employees" (Pl.'s Br. 35)—he was "uniquely important" to the firm, specifically tied to Adondakis and Chiasson, and one of only four Level Global employees linked to receiving and trading on inside information (even if unwittingly). Although Ganek contends that the search of his emails was overbroad because the warrant application did not use key words for that aspect of the

_____

application authorized the search as to Chiasson and the fourth Level Global employee—for the same spaces and devices that were searched for Ganek—based in significant part on the information provided by Adondakis.

[6]  Most of the cases on which Ganek relies for his "overbreadth" argument—including those representing purported trends in Fourth Amendment law—were decided after the November 2010 through February 2011-time period at issue in the complaint. Any such legal developments are irrelevant here, as the defendants' conduct must be evaluated based on clearly established law at the time of the relevant conduct. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).

14

search, this Court has "not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants." *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013). Courts have determined, moreover, that broader categories of documents and records may properly be seized during investigations of more complex criminal offenses. *See, e.g., United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015); *United States v. Cohan*, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009).

There is no need to invoke the "all records" doctrine to defend the scope of the Level Global search (Pl.'s Br. 34)—the Government never sought to obtain records of all activity from Level Global as though the fund was pervaded by criminal activity. *See U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989). Instead, the warrant was limited to targeted locations (associated with particular individuals) within the fund's offices and key word searches of the fund's servers, and the same would be true with a corrected affidavit. (*See* JA 70-73).

The other cases Ganek cites are equally inapposite. (Pl.'s Br. 32-33). Unlike the warrants in *Zemlyansky* and *Vilar*, which did not identify the crimes under investigation or focus on the aspects of the business for which there was probable cause to search, the Level Global warrant concentrated on locations associated with particular employees and properly accounted for

15

the target offenses. *Compare United States v. Zemlyansky*, 945 F. Supp. 2d 438, 454, 457-59, 465 (S.D.N.Y. 2013), *and United States v. Vilar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041, at *20-22 (S.D.N.Y. Apr. 4, 2007), *with* JA 68, 70. And nothing in *Levin* suggests that a corrected affidavit cannot establish probable cause to support a search of a person's property for evidence of crimes committed by others. *See United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5602876, at *7-8 (S.D.N.Y. Sept. 23, 2015); *see also United States v. Lustyik*, 57 F. Supp. 3d 213, 229 (S.D.N.Y. 2014) (rejecting overbreadth challenge to search of one defendant's email account for evidence of crime committed by a different defendant).

The corrected affidavit would use the same language as the original application to explain the need to search computers, electronic devices, cellular phones, and other books and papers for evidence of the types of criminal activity under investigation. (JA 107-08 (¶¶ 19(a)-(d))). While these sections referenced "[p]articipants in fraudulent schemes," Ganek *was just that*, given the uncontested statement that he traded on the basis of Inside Information. Even if a corrected affidavit adjusted this language to clarify his level of knowledge, there would still be ample probable cause to permit the search of the specified categories of documents for evidence of crimes committed by Ganek's colleagues—whether Ganek was a knowing participant in the illegal activity or an unwitting one. *See United States v. Martin*, 426 F.3d 83, 86 (2d Cir. 2005) ("once it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the

16

magistrate has probable cause to believe may be the place of concealment of evidence of the crime" (internal quotation marks omitted)). For all of these reasons, a corrected affidavit would have established probable cause for the same search of Ganek's office, records, and electronic devices.

Even accepting the false premise that a corrected affidavit would support only a narrower search of Ganek's office, records, and devices, the defendants still would be entitled to qualified immunity because the complaint alleges that it was Ganek's inclusion in the warrant *at all* that caused the alleged harm. There is no suggestion in the complaint that Level Global could have remained open if the warrant had been more narrowly drawn as to Ganek's property. To the contrary, Ganek repeatedly alleges that he needed a "statement" from federal officials effectively exonerating him of misconduct in order to "reassure" investors. (*See* JA 19 (¶ 8), 43 (¶ 118), 45 (¶ 127)). The scope of the search is thus irrelevant to the corrected affidavit analysis in this case.

Because a hypothetical corrected affidavit would have established probable cause to search Ganek's office, records, and devices, any purported misstatement or omission in the search warrant affidavit was not "necessary to the finding of probable cause." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). At a minimum, "officers of reasonable competence could disagree whether there was probable cause" in the corrected affidavit to search Ganek's office, records, and devices for evidence of the crimes of others, especially to the extent they may have used him as a conduit for their

17

own insider trading. *See Escalera v. Lunn*, 361 F.3d 737, 747 (2d Cir. 2004).[7] This is not a "doubtful case[ ]," *Velardi*, 40 F.3d at 574, and the defendants therefore are entitled to qualified immunity under any formulation of the corrected affidavit analysis.

## C. Ganek Has No Independent Fifth Amendment Claim

Ganek's lone remaining Fifth Amendment claim—the alleged denial of procedural due process for the deprivation of his personal property seized during the search[8]—is not independent of his Fourth Amendment claim. The Fifth Amendment claim is premised entirely on the same alleged misrepresentation in the search warrant affidavit that forms the basis of his Fourth Amendment claim (JA 171), and Ganek's failure to allege a false statement in the affidavit is fatal to both.

Ganek's Fifth Amendment claim also fails if the Fourth Amendment claim is dismissed as a result of the corrected affidavit analysis. Unlike in *Ricciuti v.*

––––––––––

[7] Criminal cases assessing the "good faith" exception to the exclusionary rule have no bearing on the defendants' entitlement to qualified immunity in civil litigation. (*See* Pl. Br. 54 n.12).

[8] Far from "validating" Ganek's "core due process claim" (Pl.'s Br. 26), the district court properly dismissed the bulk of Ganek's Fifth Amendment allegations. (JA 171-74, 177-78).

18

*N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997), where a statement allegedly was fabricated after a lawful arrest and then forwarded directly to prosecutors for use at trial, or *Morse v. Fusto*, 804 F.3d 538, 547-48 (2d Cir. 2015), where allegedly falsified evidence was presented to a grand jury, the search of Ganek's personal property would have been permitted by a neutral magistrate judge even after the supposed misstatement in the warrant application was corrected. In that event, Ganek could not claim to have suffered any deprivation of property without due process. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975).

## POINT II

### Ganek Does Not Plausibly Allege That Any Supervisors Knew of Any Misrepresentation or Omission in the Search Warrant Affidavit

#### A. Ganek's Allegations of Supervisory Knowledge Lack Any Factual Basis

Ganek's summary of purported support for his supervisory liability claims (Pl.'s Br. 40-42) only confirms the complete absence of factual allegations that any supervisor ever had notice of any alleged misstatement in the search warrant affidavit.

First, Ganek alleges that insider trading was a "top criminal priority" of the U.S. Attorney's Office. (Pl.'s Br. 40). But of course, there is nothing wrong with prioritizing the investigation of insider trading, nor with using wiretaps, search warrants, or any other lawful investigatory methods to root out such activity. While

19

Ganek protests the use of search warrants to obtain evidence from "legitimate businesses" (Pl.'s Br. 41), the district court recognized that the Fourth Amendment permits a search of *any* location where there is probable cause to believe that evidence of a crime may be found, and the decision to employ a search warrant to obtain evidence of insider trading at Level Global was entirely lawful. (JA 168-69).[9]

The allegation that supervisors would have been "kept apprised of developments in significant insider-trading investigations like this one" (Pl.'s Br. 40), and approved the decision to seek and execute a search warrant at the offices of Level Global (*id.* at 41), likewise provides no basis to infer that they ever learned of a supposed misstatement in the warrant affidavit. There is a wide chasm between being briefed and approving key investigatory steps—routine aspects of overseeing a law enforcement investigation—and signing off on the fabrication of evidence by subordinates. Ganek cites not a single case to support the district court's implausible inference that an FBI agent or prosecutor who had decided to fabricate evidence "would have run such a decision 'up the ladder'"

---

[9]   The complaint asserts, in conclusory fashion, that the defendants made a decision to "target Ganek" "despite the lack of evidence against him." (Pl. Br. 41). This fundamentally misconstrues the nature of a search warrant, which is directed at a location or locations containing evidence of crimes, not at a specific person. (*See supra* Point I.B; Gov't Br. 28).

20

(JA 186 n.19). The "high-profile" nature of this inves-
tigation does not make such an inference any more
plausible. If mere oversight of a high-profile investiga-
tion were sufficient to plausibly infer knowledge of al-
legedly unconstitutional acts by subordinates, then
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), would have been
decided differently.

Ganek also relies on post-search statements by
Criminal Division Chief Zabel and U.S. Attorney Bha-
rara, which, he claims, "confirmed their direct involve-
ment in the investigation and raid." (Pl.'s Br. 42). But
Ganek makes no allegation that the contents of the
search warrant affidavit—which remained under seal
(JA 40-41 (¶ 106))—were ever discussed by these de-
fendants with Level Global representatives. That su-
pervisors were involved in and approved of key inves-
tigatory decisions, again, does not support any infer-
ence that any supervisor ever had knowledge of any
alleged misstatement in the warrant affidavit. Other-
wise, such supervisory liability claims could be suffi-
ciently alleged in nearly every case, effectively giving
rise to the *respondeat superior* liability *Iqbal* rejected.

Ganek's allegations concerning media coverage of
the execution of the search warrant at Level Global
(Pl.'s Br. 41-42) have nothing to do with the contents
of the search warrant affidavit. Even if it were true
that a supervisor alerted the media that a warrant was
about to be executed at the offices of Level Global, that
does not suggest anything about the contents of the
sealed search warrant affidavit, let alone that any su-
pervisor had knowledge of any alleged misstatement
or omission in the affidavit. And as the district court

correctly concluded (JA 169-70), Ganek cannot assert an independent constitutional claim on the basis of the alleged media tip.

Finally, Ganek's allegation that in January 2012, supervisor defendants Rodriguez, Rojas, Chaves, Garcia, and Berger were "publicly recognized by Bharara and his counterpart at the FBI for their contributions to the investigation of Level Global" (Pl.'s Br. 43), only highlights the utter lack of factual support for Ganek's claims against these defendants. Aside from paragraphs identifying their titles and roles in the investigation, this is the only allegation in the body of the complaint that refers specifically to Rodriguez, Rojas, Garcia, or Berger. The only additional factual allegation in the complaint regarding Chaves is that he was aware of and approved the FBI's initial approach to Adondakis, weeks before the November 2, 2010 proffer session even took place. That these supervisors were recognized, more than a year after the search, for their contributions to the Level Global investigation provides no support whatsoever for Ganek's claim that they knew that a statement in the search warrant affidavit supposedly had been "fabricated."

Whether considered individually or as a whole (Pl.'s Br. 40), Ganek's allegations do not show, as they must, that any supervisor was aware of any supposed misstatement in the warrant affidavit at any time. His allegations of supervisory knowledge are premised on his speculation that supervisors would have learned of a misstatement merely by virtue of their overseeing the investigation or signing off on the decision to seek a search warrant. Indeed, Ganek's inability to identify

22

when or how supervisors supposedly learned this information—he suggests, alternatively, that it could have happened before the warrant affidavit was submitted, *or* in between the raid and the closing of Level Global, *or* after the fund closed (Pl.'s Br. 44-45)—demonstrates that his allegations of knowledge lack any factual basis.

Citing cases outside the qualified immunity context, Ganek suggests that discovery will "fill the holes" in his case, and contends that the district court's proposal to limit discovery of supervisors provides "adequate safeguards" to protect their rights. (Pl.'s Br. 47). But that is not the law. The Supreme Court rejected this exact argument in *Iqbal*, holding that where the pleading standard is not met, the plaintiff is "is not entitled to discovery, cabined or otherwise." 556 U.S. at 686. This "is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity," the purpose of which is "is to free officials from the concerns of litigation, including avoidance of disruptive discovery." *Id.* at 685 (citation and internal quotation marks omitted).

## B. *Turkmen* Is of No Use to Ganek

The Supreme Court has granted *certiorari* to review this Court's decision in *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), the only case cited by the district court in support of its supervisory liability analysis. In any event, Ganek's effort to spin *Turkmen* to his advantage (Pl.'s Br. 48-50) is unpersuasive. That the plaintiffs in *Turkmen* had to allege punitive or dis-

23

criminatory intent is immaterial. They also had to al-
lege that the defendants had knowledge of the alleg-
edly unconstitutional conduct of subordinates—some-
thing Ganek also is required (and has failed) to do.

As Ganek acknowledges, the *Turkmen* court found
that in addition to alleging that the FBI Director and
Attorney General oversaw the investigation and were
briefed regularly on arrests and detentions, the *Turk-
men* plaintiffs also *specifically* alleged that the Attor-
ney General received actual notice of alleged detainee
mistreatment. (Pl.'s Br. 49 (citing 789 F.3d at 239-40)).
In contrast, the *Turkmen* court dismissed a claim
based on allegations that a supervisor "made rounds"
in the relevant detention facility "and was aware of
conditions there," finding that such allegations "lack a
specific factual basis to support a claim that [the su-
pervisor] was aware of the particular abuses at issue."
789 F.3d at 251. Here, Ganek alleges no facts to sug-
gest that any supervisor defendant received *any* report
that the warrant affidavit contained a misstatement of
fact. Instead, Ganek only surmises that they would
have gained this knowledge at some point in time
based on their general oversight roles and participa-
tion in briefings and investigatory decisions. Such
rank speculation does not suffice under *Turkmen*,
much less the standards articulated by the Supreme
Court in *Iqbal*.

24

### C. Ganek Cannot Establish Supervisory Liability Based on Allegedly Negligent Supervision

Ganek asserts that supervisors may be held personally liable under *Bivens* if they were "grossly negligent in supervising subordinates who committed the wrongful acts," citing this Court's decision in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). (Pl.'s Br. 39; *id.* at 43 (citing *Colon* factor (4)). But Ganek's gross negligence theory is foreclosed by *Iqbal*, which made clear that "[b]ecause vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676.[10] Supervisors may be held liable under *Bivens* "only if, through their own actions, they satisfy each element of the underlying constitutional tort." *Turkmen*, 789 F.3d at 250. An allegation that a supervisor was "grossly negligent" in supervising a subordinate does not satisfy "each element of the underlying constitutional tort," *id.*, or otherwise show

---

10   This Court has noted that "the Supreme Court's decision in [*Iqbal*] may have heightened the requirements [set out in *Colon*] for showing a supervisor's personal involvement with respect to certain constitutional violations." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013); *accord Raspardo v. Carlone*, 770 F.3d 97, 116-17 (2d Cir. 2014). *Warren v. Pataki*, 823 F.3d 125 (2d Cir. 2016) (cited at Pl. Br. 39), did not address the impact of *Iqbal* on the *Colon* factors; the case was decided on waiver grounds. *See* 823 F.3d at 139.

that the supervisor, "through [his or her] own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at 676.

In any event, Ganek's conclusory allegations of negligent supervision do not satisfy even the pre-*Iqbal* standards for grossly negligent supervision. *See Raspardo*, 770 F.3d at 117. Ganek does not allege that any supervisor defendant was aware of any "prior substantial misconduct" by any subordinate, much less a "problematic pattern of employee actions." *Id.* at 117. Nor does he allege facts showing that any "supervisor's neglect caused his subordinate to violate the plaintiff's rights." *Id.* Indeed, Ganek did not even contest this issue in district court. (*See* JA 11, Dkt. No. 44 at 43-45 & Dkt. No. 50 at 14 n.11).[11]

––––––––––

[11] For similar reasons, Ganek's suggestion that the supervisor defendants can be held liable based on purported "deliberate indifference to Ganek's rights by failing to act on information indicating that unconstitutional acts were occurring" should be rejected. (Pl's Br. 43 (citing *Colon* factor (5))). The "underlying constitutional violation" requires "more than deliberate indifference." *Turkmen*, 789 F.3d at 250; *see Velardi*, 40 F.3d at 573 (Fourth Amendment violation requires that false statement be made "knowingly and deliberately, or with a reckless disregard of the truth"). In any event, Ganek has not sufficiently alleged that supervisors either were "informed of" a constitutional violation (*Colon* factor (2)) or received "information indicating that unconstitutional acts were occurring" (*Colon* factor (5)). *See supra* Point II.A.

26

## POINT III

### Ganek Identifies No Clearly Established Law Requiring a Public Statement of Exoneration

Ganek fails to identify any clearly established precedent that would have placed the defendants on notice that the Constitution required them to publicly correct a misstatement in the sealed search warrant affidavit, after the warrant had been executed, to clarify Ganek's level of knowledge of his participation in insider trading at Level Global.

Like the district court, Ganek resorts to overly broad principles of law that are framed at too high a level of generality to be used in determining whether he had a clearly established constitutional right. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (qualified immunity must be evaluated "in light of the specific context of the case"). For example, Ganek cites this Court's general statements in *Colon*, 58 F.3d at 873 (*see* Pl.'s Br. 50), that "[t]he personal involvement of a supervisory defendant may be shown by evidence that . . . the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," or "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts are occurring." But in *Colon* itself, the Court held that the prison superintendent had *not* violated the inmate's rights by failing to intervene in response to a letter complaining that contraband had been placed in his cell. *See* 58 F.3d at 873. Ganek's citation to the general failure-to-intercede standard articulated in *Anderson v. Branen*, 17 F.3d

27

552, 557 (2d Cir. 1994), similarly fails to grapple with the facts of that case—which involved a supervisor who stood by while two officers assaulted a suspect and shouted homophobic epithets at him. And while Ganek cites the same abstract language from *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993), that the district court quoted (Pl.'s Br. 55 n.13), he does not respond to the extended discussion in the defendants' brief showing that *Ying Jing Gan* in fact supports the defendants' qualified immunity here. (*See* Gov't Br. 53-58 & n.13).

The cases cited by Ganek that do address the rights of persons whose property has been seized pursuant to a search warrant nowhere suggest—let alone clearly establish—any constitutional right to public correction of a sealed search warrant affidavit after the warrant has been executed. To the contrary, most of them apply the unremarkable principle that officers must stop an ongoing search if they determine they are in the wrong place—which is obviously not an issue here. (Pl.'s Br. 53-54). Ganek also cites this Court's statements in *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984), that "when a definite and material change *has* occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause exists. Therefore, the magistrate must be made aware of any material new or correcting information." (Pl.'s Br. 52). But the Court there was discussing the duty of law enforcement officers "to report any material changes in the facts contained in a warrant affidavit *that occur before the warrant is executed.*" 734 F.2d at 893 (emphasis added).

28

*Marin-Buitrago* also emphasizes that even where new information is obtained before a warrant is executed, "[t]he duty to report new or correcting information to the magistrate does not arise unless the information is material to the magistrate's determination of probable cause," *id.* at 894, and "[f]acts omitted from a warrant affidavit are not material unless they cast doubt on the existence of probable cause," *id.* at 895. There, the new facts revealed to the agents were *not* material, and therefore were not required to be reported to the magistrate judge, even though those facts indicated that the warrant affidavit had misidentified the suspect. *See id.* at 893-94. Similarly, the alleged misstatement in the warrant affidavit here was not material to the probable cause determination because a corrected affidavit still would have established probable cause to search Ganek's office and devices. *See supra* Point I.B. Under *Marin-Buitrago*, therefore, a reasonable officer would not have concluded that a correction was necessary even before the warrant was executed.

Having failed to identify any precedent involving remotely similar facts, Ganek seeks to disavow the idea "that Defendants were obligated to hold some sort of press conference exonerating Level Global," and falls back to the assertion that the defendants had a purported "constitutional obligation to do *something* in order to mitigate or avoid preventable harm." (Pl.'s Br. 55-56). By its very terms, the notion that the defendants had an obligation to "do something" cannot be "clearly established" enough to overcome qualified immunity. And in any event, the complaint specifically alleges that Level Global closed as a "direct result" of

the defendants' decision not to provide a "statement or assurance" to Level Global investors that Ganek himself was not suspected of insider trading. (JA 45 (¶ 127); *see also* JA 18-19, 42-43 (¶¶ 7-8, 113-14, 116-18, 121)). According to the complaint, therefore, the only intervention by the defendants that could have averted the closure of Level Global was a public statement—or at least a statement that Ganek could publicize to his investors—that Ganek was not a target of the investigation. Neither the district court nor Ganek has identified any precedent that would have put the defendants on notice that they had a constitutional obligation to make such a statement.

Nor *could* investigators have truthfully made such a statement. Even without the statement in the warrant affidavit regarding whether Adondakis specifically told Ganek the sources of Inside Information, Ganek was an active participant in the unlawful trades under investigation, along with his co-founder and other Level Global employees, and investigators were still gathering and reviewing evidence to determine whether anyone (including Ganek) should be charged with unlawful insider trading. Indeed, even in December 2012, nearly two years after Level Global closed, and after prosecutors had decided not to bring charges against Ganek, it would not have been possible for the defendants to truthfully state that "they did not have evidence implicating [Ganek]." (Pl.'s Br. 55). The district judge supervising the Chiasson trial found that Ganek had sufficient knowledge of the unlawful trading activities at Level Global to be deemed an unindicted co-conspirator. (JA 126 (finding that although "Adondakis certainly did not say that he expressly told

30

Ganek," "the rest of the fact[s] would support an infer-
ence by a preponderance that Mr. Ganek was aware of
the source and the nature of the information").

## CONCLUSION

**The order of the district court denying the
defendants qualified immunity should be
reversed and the claims against the defendants
should be dismissed.**

Dated:    New York, New York
          December 27, 2016

                         Respectfully submitted,

                         JOON H. KIM,
                         *Acting United States Attorney
                         for the Southern District of
                         New York,
                         Attorney for Defendants-
                               Appellants.*

ANDREW E. KRAUSE,
SARAH S. NORMAND,
JEFFREY S. OESTERICHER,
    *Assistant United States Attorneys,
          Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6,980 words in this brief.

JOON H. KIM,
*Acting United States Attorney*
*for the Southern District of*
*New York*

By: ANDREW E. KRAUSE,
SARAH S. NORMAND,
*Assistant United States Attorney*